1  KAMALA D. HARRIS
   Attorney General of California
2  RICHARD F. WOLFE
   Supervising Deputy Attorney General
3  DOUGLAS E. BAXTER
   Deputy Attorney General
4  State Bar No. 201351
    600 West Broadway, Suite 1800
5   San Diego, CA 92101
    P.O. Box 85266
6   San Diego, CA 92186-5266
    Telephone:  (619) 645-2034
7   Fax:          (619) 645-2012
    E-mail:  Douglas.Baxter@doj.ca.gov
8  *Attorneys for Defendants State of California*
   *(by and through the California Highway*
9  *Patrol) and Sergio Flores*

10          **IN THE UNITED STATES DISTRICT COURT**

11        **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

12

13

14

| | |
|---|---|
| JACOB GREGOIRE,<br><br>                          Plaintiff,<br><br>          v.<br><br>CALIFORNIA HIGHWAY PATROL,<br>an agency of the State of California;<br>SERGIO FLORES, and DOES 1 to 20,<br><br>                          Defendants. | Case No.: 14-cv-01749-GPC (DHB)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION OF CLAIMS**<br><br>Date:          January 29, 2016<br>Time:          1:30 p.m.<br>Courtroom:  2D<br>Judge:         The Honorable Gonzalo P. Curiel |

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Introduction and Summary of Argument ...................................................................... 1

Statement of the Undisputed Material Facts ................................................................ 2

    Officer Colunga Arrived and Determined the Scene was Safely
    Protected Out of Lanes and the Patients were Receiving Medical Care ........ 2

    Fire Trucks Arrived on Scenes, Blocked Two Lanes, and Created a
    Hazard ................................................................................................................ 4

    Officer Flores Arrived and Determined that Plaintiff Gregoire's Truck
    was Unnecessary to Protect the Scene and Instead Posed a Hazard to
    the Public .......................................................................................................... 7

    Plaintiff Gregoire Repeatedly Refused to Follow Orders to Move the
    Fire Truck that was Causing a Hazard and was Lawfully Arrested .............. 10

    Reasonable Force was Used in the Arrest ...................................................... 12

Argument ................................................................................................................... 13

I.     Standards of Analysis for Motion for Summary Judgment ......................... 13

II.    The First Cause of Action Under 42 U.S.C. § 1983 for Unlawful Arrest
      is Without Merit, as the Arrest was Supported By Probable Cause and
      Officer Flores is Entitled to Qualified Immunity ........................................ 14

      A.    Officer Flores Had Probable Cause to Arrest Engineer
           Gregoire For Violating California Penal Code Section
           148(a) and Vehicle Code Section 2800(a) ............................... 14

      B.    Officer Flores is Also Entitled to Qualified Immunity ............. 20

III.   Officer Flores is Also Entitled to Qualified Immunity on Plaintiff's
      Excessive Force Claim ................................................................................ 22

IV.   Plaintiff's Claim Under California Civil Code Section 52.1 is Without
      Merit Because There Was Probable Cause for His Arrest ........................... 22

V.    Plaintiff's Fourth Cause of Action For Battery is Without Merit,
      Because the Force Used By Officer Flores was Reasonable and
      Justified ....................................................................................................... 23

VI.   Plaintiff's Claim for False Imprisonment is Without Merit, as the
      Arrest was Supported By Probable Cause ................................................... 24

VII.  Plaintiff's Claim for Intentional Infliction of Emotional Distress is
      Without Merit, Because Officer Flores Did Not Engage in Outrageous
      Conduct ....................................................................................................... 24

VIII. Since Officer Flores is Not Liable on the State Law Tort Claims, the
      State (CHP) is Also Not Liable .................................................................. 25

Conclusion ................................................................................................................. 25

i

# TABLE OF AUTHORITIES

**Page**

CASES

*Acosta v. City of Costa Mesa*
   718 F.3d 800 (9th Cir. 2013) ............................................................... 15

*Alston v. Read*
   663 F.3d 1094 (9th Cir. 2011) ............................................................. 21

*Anderson v. Creighton*
   483 U.S. 635 (1987) ............................................................................ 20

*Asgari v. City of Los Angeles*
   15 Cal. 4th 744 (1997) ........................................................................ 23

*Ashcroft v. al-Kidd*
   563 U.S. 731 (2011) ..................................................................... 14, 20

*Brown v. Ransweiler*
   171 Cal. App. 4th 516 (2009) ............................................................. 23

*C.F. ex rel. Farnan v. Capistrano Unified Sch. Dist.*
   654 F.3d 975 (9th Cir. 2011) ............................................................. 20

*Celotex Corp. v. Catrett*
   477 U.S. 317 (1986) ............................................................................ 13

*Collins v. City and County of San Francisco*
   50 Cal. App. 3d 671 (1975) ................................................................ 23

*Davidson v. City of Westminster*
   32 Cal. 3d 197. (1982) ........................................................................ 24

*Devenpeck v. Alford*
   543 U.S. 146 (2004) ............................................................................ 15

*Edson v. City of Anaheim*
   63 Cal. App. 4th 1269 (1998) ............................................................. 23

*Hamilton v. City of San Diego*
   217 Cal. App. 3d 838 (1990) .............................................................. 24

ii

# TABLE OF AUTHORITIES
### (continued)

Page

*Hansen v. Black*
   885 F.2d 642 (9th Cir. 1989) ................................................................. 22

*Hayes v. County of San Diego*
   736 F.3d 1223 (9th Cir. 2013) ............................................................... 23

*Hayes v. Garcia*
   461 F. Supp. 2d 1198 (S.D. Cal. 2006) ................................................ 14

*In re Muhmamed C.*
   95 Cal. App. 4th 1325 (Cal. Ct. App. 2002) ....................................... 19

*Krainski v. Board of Regents of Nevada System of Higher Education*
   616 F.3d 963 (9th Cir. 2010) ................................................................. 21

*Lacey v. Maricopa County*
   649 F.3d 1118 (9th Cir. 2011) ............................................................... 21

*Matthews v. Xerox Corp.*
   319 F. Supp. 2d 1166 (S.D. Cal. 2004) ................................................ 14

*Michigan v. DeFillippo*
   443 U.S. 31 (1979) ................................................................................ 15

*Miklosy v. Regents of University of California*
   44 Cal. 4th 876 (2008) .......................................................................... 25

*National Ass'n of Optometrists & Opticians v. Harris*
   682 F.3d 1144 (9th Cir. 2012) ............................................................... 14

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*
   210 F.3d 1099 (9th Cir. 2000) ............................................................... 14

*Palmer v. Sanderson*
   9 F.3d 1433 (9th Cir. 1993) ................................................................... 22

*Pearson v. Callahan*
   555 U.S. 223 (2009) ........................................................................ 20, 21

*Reichle v. Howard*
   ___ U.S. ___ (2012) .............................................................................. 20

iii

# TABLE OF AUTHORITIES
## (continued)

Page

*Reynolds v. County of San Diego*
   84 F.3d 1162 (9th Cir. 1996) ................................................................. 22

*Rodis v. City & County of San Francisco*
   558 F.3d 964 (9th Cir. 2009) ................................................................. 19

*Saucier v. Katz*
   533 U.S. 194 (2001) ................................................................. 20, 21

*Sorrels v. McKee*
   290 F.3d 965 (9th Cir. 2002) ................................................................. 21

STATUTES

California Civil Code § 52.1 ................................................................. 2, 22

California Government Code

   § 815 ................................................................. 25

   § 851.2 ................................................................. 25

   § 815.2(b) ................................................................. 25

California Health and Safety Code

   § 1798.6 ................................................................. 1, 17

   § 1798.6(c) ................................................................. 17, 21

California Penal Code

   § 148(a) ................................................................. *passim*

   § 409.3 ................................................................. 1, 16, 17, 21

   § 835 ................................................................. 23

   § 836 ................................................................. 25

   § 836(a) ................................................................. 24

   § 847 ................................................................. 25

iv

# TABLE OF AUTHORITIES
### (continued)

**Page**

§847(b) .......................................................................................................24

California Vehicle Code

§ 830.2(a) ........................................................................................ 16

§ 2410 ............................................................................ 1, 16, 17, 21

§ 2412 ............................................................................................. 16

§ 2800(a) ................................................................................ *passim*

42 U.S.C. § 1983 .............................................................................. 1, 14

CONSTITUTIONAL PROVISIONS

Fourth Amendment .................................................................... *passim*

COURT RULES

Rule 56(a) of the Federal Rules of Civil Procedure ................................ 13

## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiff Jacob Gregoire alleges that, on February 4, 2014, while he was working as a Fire Engineer for the Chula Vista Fire Department, he was unlawfully arrested at the scene of a rollover accident on Interstate 805 by Defendant California Highway Patrol (CHP) Officer Sergio Flores.  Plaintiff's first cause of action is against Officer Flores under 42 U.S.C. § 1983 for alleged unlawful arrest under the Fourth Amendment.

Plaintiff contends Officer Flores lacked probable cause to arrest Plaintiff for refusing to follow orders from Officer Flores and his partner, Officer Eliazar Colunga, to move a fire truck out of lanes of traffic.  Yet, the totality of the circumstances justified Officer Flores's and Officer Colunga's belief that the fire truck was posing a serious risk of causing secondary accidents that could seriously injure or kill members of the approaching motoring public.  After assessing the scene, the officers reasonably believed the fire truck did not need to be parked in the southbound lanes, as the accident scene was <u>not</u> in traffic lanes and was instead well-shielded and protected from southbound I-805 traffic by two cement k-rails.

These officers had lawful authority under California Vehicle Code section 2410, California Penal Code section 409.3, and California Health and Safety Code section 1798.6 to direct that the truck be moved out of lanes.  Plaintiff refused to comply with orders to move the ruck, despite multiple requests and the warning that an arrest would result.  Officer Flores therefore had probable cause to believe that Engineer Gregoire was in violation of California Penal Code section 148(a) and California Vehicle Code section 2800(a) (provisions criminalizing refusals to follow lawful police orders and interfering with or delaying law enforcement in the exercise of their duties).  Officer Flores is also entitled to qualified immunity.

Plaintiff also asserts an excessive force claim under 42 U.S.C. § 1983.  He claims the handcuffs were too tight and that, while he asked Officer Flores to loosen them, Officer Flores allegedly tightened them.  Yet, Plaintiff admits he did

1

1  not complain of pain and that he suffered no physical injuries from the handcuffs.

2  Officer Flores is also entitled to qualified immunity on this claim.

3       Plaintiff's third through sixth causes of action are against the State (CHP) and

4  Officer Flores for unlawful arrest under California Civil Code section 52.1, battery,

5  false imprisonment, and intentional infliction of emotional distress.  Plaintiff's state

6  law claims fail for the same reasons that his two federal claims fail.

## STATEMENT OF THE UNDISPUTED MATERIAL FACTS

### Officer Colunga Arrived and Determined the Scene was Safely Protected Out of Lanes and the Patients were Receiving Medical Care

10      During the evening of February 4, 2014, CHP Officer Eliazar Colunga was on

11  duty for the C-watch (5:00 p.m. to 5:30 a.m.).  (Defendants' Separate Statement of

12  Undisputed Material Facts in Support of Defendants' Motion for Summary

13  Judgment, or, in the Alternative, Summary Adjudication [hereafter SSUMF][1], Fact

14  1.)  During this time period, Officer Colunga was wearing a tan CHP uniform that

15  bore CHP patches identifying him as a law enforcement officer.  (SSUMF, Fact 2.)

16  Defendant Sergio Flores was also on duty for the C-watch as a CHP patrol officer,

17  and he too was wearing a tan CHP uniform with CHP patches showing he was a law

18  enforcement officer.  (SSUMF, Facts 4 & 5.)  Both officers had extensive

19  experience, as Officer Colunga had been a CHP patrol officer for nearly seventeen

20  years, and Officer Flores had been a CHP patrol officer since July 1994.  (SSUMF,

21  Facts 3 & 6.)

22      Just before 9:30 p.m., Officer Colunga responded to a radio call about an

23  overturned vehicle near I-805 and Telegraph Canyon Road.  (SSUMF, Fact 7.)  The

24  collision occurred in the northbound lanes of the I-805, and the vehicle to which

25  Officer Colunga was responding came to rest in a wide construction area between

26  cement k-rail walls separating the northbound and southbound lanes.  (SSUMF,

27  _____

[1] All citations in this memorandum to the SSUMF are intended to incorporate the supporting evidence provided in the SSUMF for each fact.

28

2

Fact 8.)  Officer Colunga saw no other on-duty emergency responders at the scene when he arrived.  He parked his patrol car south of the collision in the center construction area (and out of traffic lanes), where the k-rails on the southbound side ended and the center construction area was accessible.  (SSUMF, Fact 9.)

Based on his training and experience over nearly 17 years as a CHP Officer, Officer Colunga believed that, as the law enforcement officer on scene, he was the Incident Commander when he arrived.  (SSUMF, Fact 10.)  Officer Colunga approached the overturned vehicle and made contact with two civilians (one of whom was an off-duty Emergency Medical Technician [EMT]) who had come upon the accident scene after the accident but before Officer Colunga arrived.  (SSUMF, Fact 11.)  Officer Colunga observed that both occupants of the rollover vehicle were already out of the vehicle and that neither one had required any extraction equipment or on-duty emergency personnel to get out of the vehicle.  (SSUMF, Fact 12.)  Officer Colunga saw that these individuals were conscious, with one lying on the ground and the other standing.  During the evening, Officer Colunga was able to communicate with the two occupants.  (SSUMF, Fact 13.)

Seeing that the off-duty EMT was holding the head of the person on the ground in C-spine position and was without equipment, Officer Colunga went to his vehicle to retrieve a first aid bag that would have a C-spine collar.  (SSUMF, Fact 14.)  On the way to his patrol car, Officer Colunga saw an ambulance from American Medical Response (AMR) arrive and park in the center construction area just south of Officer Colunga's patrol car and out of traffic lanes.  The ambulance had its emergency lights activated.  (SSUMF, Fact 15.)  Seeing the ambulance crew walking to the rollover vehicle with their gear, Officer Colunga determined it was unnecessary for him to retrieve a first aid bag.  (SSUMF, Fact 16.)  He saw three people from the AMR ambulance, and, at the time, he believed all three were paramedics.  He did not learn until well after the events of the evening that two of them were paramedics and one was an EMT.  (SSUMF, Fact 17.)

3

MEMO. OF POINTS AND AUTHORITIES IN SUPPORT OF DEFS.' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION (14-cv-01749-GPC (DHB))

Based on the presence of the ambulance crew, Officer Colunga concluded that sufficient medical care was then on scene for the two occupants of the rollover vehicle, so he moved on to engage in other scene management and investigation activities.  (SSUMF, Fact 18.)  Based on his training and experience as a CHP Officer, Officer Colunga considers a CHP Officer's responsibilities as an Incident Commander at a traffic scene to include assessing the entire scene, making sure that medical care has been summoned for any potentially injured parties, making sure that the people on scene (civilians and first responders) are safe and not in the way of traffic or in any type of hazard.  He considers CHP Officers to be responsible for managing the entire scene, which includes controlling where equipment and personnel are located so as to minimize safety hazards to those on scene and to the motoring public nearby or approaching the scene.  (SSUMF, Fact 19.)

### Fire Trucks Arrived on Scenes, Blocked Two Lanes, and Created a Hazard

Soon after the ambulance arrived, fire trucks began arriving.  Officer Colunga saw Chula Vista Engine 52 arrive and park in the number 1 southbound lane.  (SSUMF, Fact 20.)  Two other fire trucks arrived in short succession and parked behind Engine 52, blocking the number 1 and 2 lanes (the lanes closest to the center of the southbound roadway).  A fourth fire truck also came to the scene.  (SSUMF, Fact 21.)  Believing the patients were being attended to by paramedics and that there was no collision scene in traffic lanes, Officer Colunga became concerned about fire trucks blocking lanes.  (SSUMF, Fact 22.)  He believed that there were sufficient medical personnel to help the patients, that too many fire crews were on scene, and that the trucks should be moved out of lanes.  (SSUMF, Fact 23.)

Officer Colunga talked to crew members from two trucks and explained they were not needed and should leave the scene and return to their stations.  These two trucks left within a few minutes.  (SSUMF, Fact 24.)  Officer Colunga subsequently had conversations with members of the other two fire crews to ask them to move

their trucks to the center median. (SSUMF, Fact 25.) Officer Colunga was concerned about unnecessary placement of trucks in traffic lanes, as CHP Officers are taught by CHP, and he also knows from his personal experience in responding to other traffic accidents, that secondary accidents at collision scenes are a serious risk to the motoring public. (SSUMF, Fact 26.) Officer Colunga knew and believed that placement of emergency equipment at collision scenes creates a serious risk of causing secondary accidents among other motorists approaching the scene. (SSUMF, Fact 27.) Officer Colunga knew and believed that an important part of CHP officers' duties as incident managers is to take appropriate steps to eliminate possible causes of secondary accidents. (SSUMF, Fact 28.)

Officer Colunga's analysis of why he believed the placement of fire trucks was causing a risk of secondary vehicle accidents that could harm the public included the observation that there were four southbound lanes in the immediate area. (SSUMF, Fact 29.) His analysis also included the observation that, north of the scene, there were no shoulders in the southbound lanes because of the cement k-rail running adjacent to the inner edge of the number 1 lane. (SSUMF, Fact 30.) Then, he took into account his observation that the trucks were blocking the number 1 lane and approximately one-half of the number 2 lane for southbound traffic. (SSUMF, Fact 31.) His analysis of the risk of secondary accidents also included the observation that, north of the collision scene, there is a crest in the roadway. He perceived that this would prevent southbound traffic from having a direct line of sight to see the fire trucks from a long distance. He believed there was a short distance between the point where cars would come over the crest and the point where the first trucks were stopped, which would not allow a lot of reaction time for southbound vehicles that could be approaching the scene at high speeds. (SSUMF, Fact 32.) His analysis further included the knowledge that, on a freeway such as the I-805, vehicles typically travel at high rates of speed. (SSUMF, Fact 33.) Furthermore, his analysis of the risk included the knowledge that, particularly

1   at the beginning of his time at the scene, he could hear people locking their brakes

2   as they approached the scene.  (SSUMF, Fact 34.)

3      Based on his observations, Officer Colunga formed the opinion that there was

4   a significant risk of secondary collisions from the placement of fire trucks in lanes.

5   (SSUMF, Fact 35.)  He also perceived that the collision scene was enclosed in the

6   construction area, with cement k-rails blocking it from southbound and northbound

7   traffic.  (SSUMF, Fact 36.)  He determined there was no debris from the collision in

8   the southbound lanes, as no part of the collision occurred there.  (SSUMF, Fact 37.)

9      Based on his training and experience and assessment of the scene, Officer

10  Colunga formed the opinion (at the traffic scene) that the placement of the fire

11  trucks in lanes was creating a serious risk to the motoring public without apparent

12  reason.  (SSUMF, Fact 38.)  Based on his analysis and conclusions, he wanted the

13  fire trucks moved out of lanes for public safety.  This was the reason he asked the

14  crews to move the trucks out of lanes.  (SSUMF, Fact 39.)

15     Despite Officer Colunga's requests to the remaining two Chula Vista Fire

16  crews to move their trucks, the trucks were not moved.  (SSUMF, Fact 40.)  After

17  making his initial requests, Officer Colunga went back to the overturned vehicle to

18  try to gather some information from one of the victims.  (SSUMF, Fact 41.)  He

19  subsequently noticed that the two fire trucks were still parked in lanes, so he went

20  back to speak to the fire crews again and request that they move the fire trucks.

21  (SSUMF, Fact 42.)  It was at this point that Officer Colunga saw Officer Sergio

22  Flores walk up to where Officer Colunga was standing with the fire fighters, close

23  enough to where, in Officer Colunga's opinion, Officer Flores could have

24  overheard the conversation.  (SSUMF, Fact 43.)  Officer Colunga wanted the fire

25  crews to move the fire trucks when he asked them to do so, and he expected them to

26  comply with his requests.  Yet, they did not.  (SSUMF, Fact 44.)

27  / / /

28  / / /

6

**Officer Flores Arrived and Determined that Plaintiff Gregoire's Truck was Unnecessary to Protect the Scene and Instead Posed a Hazard to the Public**

Since this collision scene was on Officer Flores' beat, Officer Colunga knew that Officer Flores was taking over Officer Colunga's role as Incident Commander (i.e., in charge of scene management) once Officer Flores arrived.  (SSUMF, Fact 45.)  Officer Flores initially became involved in these events at approximately 9:30 p.m., when he heard radio traffic about a collision on I-805, just south of Telegraph Canyon Road.  (SSUMF, Fact 49.)  After clearing a traffic stop in Mission Valley, Officer Flores began driving southbound on the I-805 to respond to the accident.  (SSUMF, Fact 50.)  Since the accident was in his beat area, his intent was to follow his understanding of normal practice amongst CHP Officers and respond to the collision scene to take over the collision investigation and take over as the incident manager (often referred to as Incident Commander).  (SSUMF, Fact 51.)

Upon approaching the scene, Officer Flores saw that traffic was backing up, so he began a traffic break to bring traffic approaching the scene in slowly.  (SSUMF, Fact 52.)  Officer Flores came upon a fire truck that was parked mostly in the number 1 lane (i.e., closest to the center median) and partially into the number 2 lane.  (SSUMF, Fact 53.)  Where this fire truck was stopped, Officer Flores could see there was a cement k-rail immediately butting up against the east side of the southbound number 1 lane.  Thus, from the rear of the fire truck and proceeding back (i.e., northbound) along the eastern edge of the southbound I-805 for a substantial distance, there was cement k-rail abutting the number 1 lane.  (SSUMF, Fact 54.)  Because he saw the fire truck blocking the number 1 lane and part of the number 2 lane, Officer Flores initially believed that the accident must be located in the number 1 lane in front of the fire truck.  (SSUMF, Fact 55.)

Officer Flores therefore stopped his patrol car approximately 100 feet behind this fire truck and began laying a flare pattern on the road, proceeding from the rear of his patrol vehicle in a diagonal pattern moving southbound toward the number 2

lane.  (SSUMF, Fact 56.)  As he moved his flare pattern close to the fire truck, he saw that the actual collision scene was to his left in a construction area on the other side of the k-rails.  He perceived that the collision scene was between cement k-rails that blocked off a large construction area between the northbound and southbound lanes.  (SSUMF, Fact 57.)  He concluded that the collision scene was not in any traffic lanes.  (SSUMF, Fact 58.)  He saw fire personnel, paramedics, and at least one of the people who had been involved in the collision near the vehicle in this center area.  (SSUMF, Fact 59.)  He determined that the collision had occurred on the northbound side and that the vehicle had come to rest in the construction area.  (SSUMF, Fact 60.)  He saw paramedics providing medical care to the vehicle occupants.  (SSUMF, Fact 61.)

Very soon after completing his flare pattern, Officer Flores saw Officer Colunga (who had arrived before Officer Flores) speaking to a group of firefighters.  (SSUMF, Fact 62.)  Officer Flores heard Officer Colunga asking the group why they had not yet moved their fire engine.  (SSUMF, Fact 63.)  Officer Flores heard Officer Colunga say that he had told them several times that they needed to move their fire engine.  (SSUMF, Fact 64.)  Officer Flores heard Officer Colunga state that the collision scene was safely within the construction area and that the truck was not providing any protection.  (SSUMF, Fact 65.)

Based on his training and experience and his personal observations of the scene, Officer Flores formed the conclusion that having fire trucks parked in lanes was not necessary to protect the scene.  (SSUMF, Fact 66.)  Based on his training and experience with having responded to and investigated multiple traffic collisions, he formed the belief that the fire truck was presenting an unnecessary risk to the public.  (SSUMF, Fact 67.)  He also knew that CHP Officers were trained that part of their role in managing traffic scenes is to make sure that the placement of vehicles and equipment is done in such a way as to prevent the serious problem of secondary automobile collisions.  (SSUMF, Fact 68.)  He knew that

such accidents occur due to the motoring public's surprise and confusion resulting from suddenly encountering lane blockages from emergency equipment in roadways at accident scenes and that this is a particular risk on freeways, where traffic can come upon accident scenes at high speeds.  (SSUMF, Fact 69.)  Clearing lanes at traffic scenes to protect the public is a key part of CHP Officers' responsibilities as traffic incident managers.  (SSUMF, Fact 70.)  Officer Flores knew that CHP Officers are responsible for managing the entire scene of a traffic accident to protect the safety of people present at the scene and to protect the motoring public near the scene.  (SSUMF, Fact 71.)

Officer Flores's analysis of the scene management issues at this particular traffic scene also included his perception that the ambulance which had responded to treat patients was parked in the center median area and out of traffic lanes.  (SSUMF, Fact 72.)  His analysis of these issues also included his realization that the collision did not occur in any southbound lanes, so there was no debris field in any southbound lanes.  (SSUMF, Fact 73.)  He had made these observations by the time he was overhearing the conversation between Officer Colunga and the fire fighters.  (SSUMF, Fact 74.)  Officer Flores formed the belief that having fire trucks parked in lanes was posing a serious risk to the public and that this was not needed to protect the accident scene.  He believed the accident scene to be fully shielded in a large center construction area by cement k-rail walls.  (SSUMF, Fact 75.)  His analysis of the scene management issues at this scene also included the fact that the truck he was trying to get to move was on the I-805, which is a freeway on which people commonly travel at high speeds.  (SSUMF, Fact 76.)  He was concerned about vehicles approaching from the north at high speeds and unexpectedly coming upon stopped emergency vehicles without time to react.  (SSUMF, Fact 77.)  He was concerned about secondary accidents occurring and additional people getting injured or killed.  (SSUMF, Fact 78.)

/ / /

9

MEMO. OF POINTS AND AUTHORITIES IN SUPPORT OF DEFS.' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION (14-cv-01749-GPC (DHB))

**Plaintiff Gregoire Repeatedly Refused to Follow Orders to Move the Fire Truck that was Causing a Hazard and was Lawfully Arrested**

Since he believed this to be his accident scene, Officer Flores assumed he was taking the role of managing the scene upon his arrival.  (SSUMF, Fact 79.)  In his efforts to get the truck moved, Officer Flores called out to a group of fire fighters and asked who was driving the truck.  (SSUMF, Fact 80.)  An Engineer (later identified as Plaintiff Jacob Gregoire) stated that he as driving the truck.  (SSUMF, Fact 81.)  Officer Flores directed Plaintiff to move the truck.  (SSUMF, Fact 82.)  Plaintiff stated that he was not going to move the truck.  (SSUMF, Fact 83.)  Officer Flores told Plaintiff that he was giving Plaintiff a direct order to move his fire truck because Officer Flores believed it was causing a hazard.  (SSUMF, Fact 84.)  Despite Officer Flores repeating the direction to move his truck, Plaintiff continued to state that he would not move it.  (SSUMF, Fact 85.)  Officer Flores then stated that, if Plaintiff did not move the fire truck, Officer Flores was going to arrest him for disobeying an order and for delaying the officers in their investigation.  (SSUMF, Fact 86.)  Plaintiff told Officer Flores to go ahead and arrest him.  Plaintiff refused to move the truck.  (SSUMF, Fact 87.)

At this point, Officer Flores believed: that Plaintiff was capable of driving the fire truck, that Plaintiff was the driver of the fire truck, that Officer Flores had given Plaintiff an order to move the truck pursuant to Officer Flores' duties to manage the traffic scene for public safety, that Plaintiff was refusing to comply with that order despite several requests, that Officer Flores had warned Plaintiff that he would be arrested if he did not comply, and that Plaintiff was continuing to refuse to comply. (SSUMF, Fact 88.)  Based on the circumstances, Office Flores formed the belief that Plaintiff was violating California Penal Code § 148(a) and California Vehicle Code § 2800(a) by failing to follow Officer Flores' orders and for hindering/delaying Officer Flores' management and investigation of the scene. (SSUMF, Fact 89.)

10

1   Officer Flores directed Plaintiff to step over a k-rail (one that was between the

2   two k-rails on the northbound and southbound sides of the center portion of I-805).

3   (SSUMF, Fact 90.) Plaintiff stepped over the k-rail, and Officer Flores placed him

4   under arrest. (SSUMF, Fact 91.) Officer Flores placed handcuffs on Plaintiff's

5   wrists and walked him back to Officer Flores' patrol car. (SSUMF, Fact 92.)

6   Prior to arresting Plaintiff, Officer Flores did not see Plaintiff engaging in any

7   activities that Officer Flores perceived to be patient care. (SSUMF, Fact 93.) To

8   Officer Flores, it appeared that Plaintiff was standing with a group of other fire

9   fighters while others were actually treating patients. (SSUMF, Fact 94.) Indeed,

10   still shots of news media video images of the scene show points just prior to the

11   arrest where multiple fire fighters were present, including a point just prior to

12   Officer Flores calling out for the driver of the truck where Plaintiff appeared to be

13   standing in a group. (SSUMF, Fact 94.) Officer Colunga also never witnessed

14   Plaintiff engaging in activities that Officer Colunga perceived to constitute patient

15   care; instead, prior to the arrest, Officer Colunga saw Plaintiff standing with a

16   group of fire fighters in the center median area. At this time, Plaintiff did not

17   appear to Officer Colunga to be assisting in patient care. (SSUMF, Fact 46.) Prior

18   to ordering Plaintiff to move the fire truck, Officer Flores was aware that the

19   patients were being treated by paramedics from an ambulance. (SSUMF, Fact 95.)

20   Given his belief that the patients were being treated by paramedics, Officer Flores

21   perceived no reason why Plaintiff could not move the truck. (SSUMF, Fact 96.)

22   Officer Flores did not see any indication that Plaintiff was engaged in any fire

23   suppression activities, nor did Officer Flores perceive any signs of risk of fire at the

24   scene so as to justify keeping the fire truck in its location. (SSUMF, Fact 97.) The

25   same was true for Officer Colunga. At no time did Officer Colunga see a fire, see

26   smoke, smell smoke, see or smell any leaking gas from the overturned vehicle, see

27   any movement in the overturned vehicle, see any sparking near the overturned

28   vehicle, or detect any other indications that there was a likelihood of fire occurring

11

1  at the scene.  (SSUMF, Fact 47.)  Plaintiff and Captain Albright acknowledge they

2  were not involved in fire suppression activities and did not perceive signs indicating

3  a risk of the vehicle catching on fire.  (SSUMF, Fact 98.)  At this scene, Officer

4  Colunga also did not form a belief that it would be necessary for the fire trucks to

5  remain blocking lanes in order to protect the pathway of the ambulance when it

6  came time for it to leave the scene.  (SSUMF, Fact 48.)  Officer Flores' purpose in

7  ordering Plaintiff to move the fire truck was to eliminate a risk that Officer Flores

8  believed it was posing to public safety.  (SSUMF, Fact 99.)

9        **Reasonable Force was Used in the Arrest**

10       The force used in arresting Plaintiff began with Officer Flores directing

11  Plaintiff to step over the k-rail, whereupon Officer Flores placed him under arrest.

12  (SSUMF, Fact 100.)  Officer Flores placed handcuffs on Plaintiff's wrists and

13  walked him back to Officer Flores' patrol car.  (SSUMF, Fact 101.)  In the course

14  of searching Plaintiff before placing him in the patrol car, Officer Flores double-

15  locked the handcuffs.  (SSUMF, Fact 102.)  The point in double locking the

16  handcuffs is to prevent the handcuffs from tightening.  (SSUMF, Fact 103.)  Officer

17  Flores did not intentionally tighten the handcuffs on Plaintiff.  (SSUMF, Fact 104.)

18       In his deposition, Plaintiff made several admissions showing the lack of

19  excessive force and lack of injuries.  First, he admitted that the only two statements

20  he made to Officer Flores regarding the handcuffs were to ask Officer Flores, in the

21  moments just prior to being placed in the patrol car, whether Officer Flores could

22  loosen the handcuffs.  (SSUMF, Fact 105.)  Next, he admitted that Officer Flores

23  never said anything like, "No, I'm not going to loosen them?" or "I'm going to

24  tighten them."  (SSUMF, Fact 106.)

25       Plaintiff also admitted that he does not recall ever checking his wrists between

26  the time of his release from the handcuffs to the next morning to see if there were

27  any marks on his wrists.  (SSUMF, Fact 107.)   Between the time of his release

28  from the handcuffs to the time of his deposition on September 16, 2015, he never

took any photographs to document any marks that he believed to have been left on either of his wrists from the handcuffs.  (SSUMF, Fact 108.)  He never sought any medical care from any type of medical provider for injuries that he attributes to the handcuffs.  (SSUMF, Fact 109.)  He never showed his wrists to anyone after the point of being released to say, "Hey, look, I've got marks from the handcuffs." (SSUMF, Fact 110.)

The only pain that Plaintiff claimed to have encountered after the time the handcuffs were removed was as follows: "I think they were sore on my walk back, but I had a lot of adrenaline going on from what had just happened, so I may have put it out of my mind at that time.  It was just a relief to have them off."  (SSUMF, Fact 111.)  Yet, he admitted that his wrists were not sore the next morning when he woke up.  (SSUMF, Fact 112.)  He testified that, from the time he was released up to the time of his September 16, 2015, deposition, he has not experienced any pain in either wrist where the handcuffs had been.  (SSUMF, Fact 113.)

Plaintiff admits that no part of his body was physically hurt as a result of Officer Flores' actions from the point of his first physical contact with Plaintiff in the course of the arrest to the point where Plaintiff was released from the vehicle and let go.  (SSUMF, Fact 114.)  Other than his claim that the handcuffs were too tight, Plaintiff admits that Officer Flores did not engage in any activity that Plaintiff believed to be improper use of force.  (SSUMF, Fact 115.)

## ARGUMENT

### I. STANDARDS OF ANALYSIS FOR MOTION FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is mandated where the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp.*

13

MEMO. OF POINTS AND AUTHORITIES IN SUPPORT OF DEFS.' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION (14-cv-01749-GPC (DHB))

1 | *v. Catrett*, 477 U.S. 317, 322 (1986).

2 |     For claims on which the moving party does not bear the burden of persuasion

3 | at trial, the moving party bears the initial burden of producing evidence that either

4 | negates an essential element of the nonmoving party's case or shows the

5 | nonmoving party lacks sufficient evidence on an essential element to meet its

6 | burden of proof at trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies,*

7 | *Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  If the moving party meets this initial

8 | burden of production, then the burden shifts to the nonmoving party to produce

9 | evidence supporting his claims.  *Id.* at 1103.  The nonmoving party "cannot defeat

10 | summary judgment merely by demonstrating 'that there is some metaphysical doubt

11 | as to the material facts.'"  *Matthews v. Xerox Corp.*, 319 F. Supp. 2d 1166, 1172

12 | (S.D. Cal. 2004) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,

13 | 475 U.S. 574, 586 (1986)).  "[T]he nonmoving party must 'go beyond the pleadings

14 | and by her own affidavits, or by the depositions, answers to interrogatories, and

15 | admissions on file, designate specific facts showing there is a genuine issue for

16 | trial.'"  *Matthews*, 319 F. Supp. 2d at 1172 (quoting *Celotex Corp.*, 477 U.S. at

17 | 324).  The nonmoving party cannot rest on conclusory allegations.  *Hayes v.*

18 | *Garcia,* 461 F. Supp. 2d 1198, 1204 (S.D. Cal. 2006).  "The substantive law

19 | determines which facts are material; only disputes over facts that might affect the

20 | outcome of the suit under the governing law properly preclude the entry of

21 | summary judgment."  *National Ass'n of Optometrists & Opticians v. Harris*, 682

22 | F.3d 1144, 1147 (9th Cir. 2012).

**II.   The First Cause of Action Under 42 U.S.C. § 1983 for Unlawful Arrest is Without Merit, as the Arrest was Supported by Probable Cause and Officer Flores is Entitled to Qualified Immunity**

   **A.   Officer Flores had Probable Cause to Arrest Engineer Gregoire for Violating California Penal Code Section 148(a) and Vehicle Code Section 2800(a)**

27 |     An arrest is a seizure within the meaning of the Fourth Amendment.  Thus, it

28 | must be reasonable under the circumstances.  *Ashcroft v. al-Kidd*, 563 U.S. 731,

14

___, 131 S. Ct. 2074, 2080 (2011).  Here, the arrest was conducted without a warrant, so the following analysis applies:

> [A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed.  [Citations.]  Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."

*Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).

> To determine whether there was probable cause, we look to "the totality of circumstances known to the arresting officers, [to determine if] a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime."  *United States v. Smith*, 790 F.2d 789, 792 (9th Cir.1986).  While evidence supporting probable cause need not be admissible in court, it must be "legally sufficient and reliable."  *Franklin v. Fox*, 312 F.3d 423, 438 (9th Cir.2002).

*Acosta v. City of Costa Mesa*, 718 F.3d 800, 825 (9th Cir. 2013).

The reasonableness of the arrest does not depend on whether the arrestee actually committed a crime.  The mere fact that no charges were subsequently filed or even the fact that the suspect was later acquitted of the charges are irrelevant to the determination of reasonableness of the arrest.  *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979).  "[T]he kinds and degree of proof and the procedural requirements necessary for a conviction are not prerequisites to a valid arrest."  *Id.*

Here, Officer Flores formed the belief, based on the totality of the circumstances, that Plaintiff was in violation of California Penal Code section 148(a) and California Vehicle Code section 2800(a) by refusing to move the fire truck.  (SSUMF, Facts 49 - 99.)

California Penal Code section 148(a) reads:

> Every person who willfully resists, delays, or obstructs any public officer, peace officer, or an emergency medical technician, as defined in Division 2.5 (commencing with Section 1797) of the Health and Safety Code, in the discharge or attempt to discharge any duty of his or her office or employment, when no other punishment is prescribed, shall be punished by a fine not exceeding one thousand dollars ($1,000), or by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment.

California Vehicle Code section 2800(a) reads, in pertinent part, as follows:

15

MEMO. OF POINTS AND AUTHORITIES IN SUPPORT OF DEFS.' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION (14-cv-01749-GPC (DHB))

> It is unlawful to willfully fail or refuse to comply with a lawful order, signal, or direction of a peace officer, as defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2 of the Penal Code, when that peace officer is in uniform and is performing duties pursuant to any of the provisions of this code, . . . .

The undisputed material facts show that Officer Flores had probable cause to arrest Plaintiff for suspicion of violating both of these provisions through his refusal to comply with directives from the officers to move the fire trucks.

There is no dispute that Officers Flores and Colunga were peace officers for purposes of these statutes at the time of the events at issue.  Both were members of the CHP (SSUMF, Facts 1 – 6) with statewide law enforcement authority relating to the use or operation of vehicles upon state highways.  Cal. Veh. Code § 830.2(a).  Both officers were on duty and wearing their CHP uniforms identifying themselves as law enforcement officers at the time of the events at issue.  (SSUMF, Facts, 1, 2, 4, & 5.)  Plaintiff cannot dispute knowing they were law enforcement officers.

As members of the CHP, these officers had lawful authority to investigate traffic accidents involving personal injuries on any California highways.  Cal. Veh. Code § 2412.  They also held the following authority under California Vehicle Code section 2410:

> Members of the California Highway Patrol are authorized to direct traffic according to law, and, in the event of a fire or other emergency, or to expedite traffic or insure safety, may direct traffic as conditions may require notwithstanding the provisions of this code.

CHP officers' authority for management of a traffic accident scene on California highways is found under two other statutes.  First, California Penal Code section 409.3, provides (with italics added):

> Whenever law enforcement officers and emergency medical technicians are at the scene of an accident, *management of the scene of the accident shall be vested in the appropriate law enforcement agency*, whose representative shall consult with representatives of other response agencies at the scene to ensure that all appropriate resources are properly utilized. However, authority for patient care management at the scene of an accident shall be determined in accordance with Section 1798.6 of the Health and Safety Code.

16

> *For purposes of this section, "management of the scene of an accident" means the coordination of operations which occur at the location of an accident.*

Second, the referenced provision of California Health and Safety Code – section 1798.6 – provides in pertinent part (with italics added):

> (a)  Authority for patient health care management in an emergency shall be vested in that licensed or certified health care professional, which may include any paramedic or other prehospital emergency personnel, at the scene of the emergency who is most medically qualified specific to the provision of rendering emergency medical care. If no licensed or certified health care professional is available, the authority shall be vested in the most appropriate medically qualified representative of public safety agencies who may have responded to the scene of the emergency.
>
> . . . .
>
> (c)  *Notwithstanding subdivision (a), authority for the management of the scene of an emergency shall be vested in the appropriate public safety agency having primary investigative authority.  The scene of an emergency shall be managed in a manner designed to minimize the risk of death or health impairment to the patient and to other persons who may be exposed to the risks as a result of the emergency condition, and priority shall be placed upon the interests of those persons exposed to the more serious and immediate risks to life and health.  Public safety officials shall consult emergency medical services personnel or other authoritative health care professionals at the scene in the determination of relevant risks.*

California Vehicle Code section 2410, California Penal Code section 409.3, and California Health and Safety Code section 1798.6(c) provided Officers Flores and Colunga with the lawful authority to manage the scene of this accident to protect public safety, including the safety of the motoring public.  The officers reasonably believed that they represented the law enforcement agency with primary investigate authority and that they were in charge of managing the overall scene. (SSUMF, Facts 10, 45, 51, & 79.)  Congruent with the language of the above three statutes, the officers reasonably believed their duties as incident managers included assessing the entire scene, making sure that medical care had been summoned for injured parties, and controlling where equipment and personnel were located so as to minimize safety hazards to those on scene and to the motoring public (including trying to prevent secondary accidents).  (SSUMF, Facts 19, 28, 68, 70, & 71.)

17

These officers assessed this scene using their training and experience and came to the reasonable conclusions that (1) the accident scene was well-shielded in the construction area, (2) that there was no debris in the southbound lanes, that the ambulance was parked in the center median area out of lanes, (3) that placement of fire trucks in lanes did not appear necessary to protect the scene, (4) there was no apparent risk of fire requiring fire suppression activities, (5) that the ambulance would be able to safely enter the freeway at the appropriate time without the need for the fire trucks blocking lanes, and (6) that the two patients were being cared for by medically-qualified paramedics.  (SSUMF, Facts 12, 15 – 18, 20-23, 36, 37, 47, 48, 57 – 61, 65, 66, 72 – 75, & 96 – 99.)  At the same time, they applied their training and experience and assessment of the scene to conclude that the fire trucks were creating a serious risk of causing secondary accidents that could injure or kill other people.  (SSUMF, Facts 22, 23, 26, 27, 29 – 35, 38, 39, 62 – 64, 67, 69, 75 – 78, & 99.)  While Plaintiff may try to claim that he had some role in patient care, both officers never witnessed him engaging in activities that they perceived as patient care.  (SSUMF, Facts 46, 93, & 94.)

Under the totality of the circumstances known by the officers, they reasonably concluded it was appropriate to direct that the fire trucks be moved out of lanes.  The crews from four trucks (including Plaintiff's truck – Engine 52) were requested by Officer Colunga to move out of lanes even before Officer Colunga gave his orders to Plaintiff.  (SSUMF, Facts 24, 25, & 39 – 43.)  Two fire trucks left, but two did not.  (SSUMF, Facts 24 & 40 - 44.)  Officer Colunga wanted these other truck crews to comply with his requests, and he expected them to do so.  They would not.  (SSUMF, Fact 44.)  In his efforts to get a truck moved, Officer Flores turned to Plaintiff (who identified himself as the driver of the truck).  Officer Flores directed him to move the truck.  (SSUMF, Facts 80 – 82.)  Plaintiff stated that he would not move the truck.  (SSUMF, Fact 83.)  Although Officer Flores stated that he was giving a direct order to move the truck, Plaintiff still refused to move the truck.

18

(SSUMF, Facts 84 & 85.)  Officer Flores warned Plaintiff that, if he did not comply, he would be arrested for disobeying an order and for delaying officers in their investigation.  (SSUMF, Fact 86.)  Plaintiff refused to comply with these orders and told Officer Flores to go ahead and arrest him.  (SSUMF, Fact 87.)

Under these circumstances, Officer Flores reasonably concluded that a violation of California Penal Code section 148(a) and California Vehicle Code section 2800(a) was occurring in his presence.  While there is little published case law interpreting Vehicle Code section 2800(a), the statutes appear to be textually congruent with respect to failure to obey law enforcement orders.  Thus, examination of probable cause for a violation of Penal Code section 148(a) reasonably extends to the analysis for Vehicle Code section 2800(a).

> "The legal elements of a violation of section 148, subdivision (a) are as follows: (1) the defendant willfully resisted, delayed, or obstructed a peace officer, (2) when the officer was engaged in the performance of his or her duties, and (3) the defendant knew or reasonably should have known that the other person was a peace officer engaged in the performance of his or her duties. [Citations.]" (*People v. Simons* (1996) 42 Cal.App.4th 1100, 1108-1109 [50 Cal.Rptr.2d 351].)  The offense is a general intent crime, proscribing only the particular act (resist, delay, obstruct) without reference to an intent to do a further act or achieve a future consequence. (*People v. Roberts* (1982) 131 Cal.App.3d Supp. 1, 8-9 [182 Cal.Rptr. 757].)

*In re Muhhamed C.*, 95 Cal. App. 4th 1325, 1329 (Cal. Ct. App. 2002).

Officer Flores possessed sufficient facts on which to justify an arrest for violation of this offense.  His probable cause determination did not require him to have the same type of specific evidence of each element of the offense that would be needed to support a conviction. *Rodis v. City & County of San Francisco*, 558 F.3d 964, 969 (9th Cir. 2009).  Also, it is only when specific intent is an element of the crime that an officer must have probable cause for such intent. *Id.*  Penal Code section 148(a) is a general intent crime. *In re Muhhamed C.*, 95 Cal. App. 4th at 1329.  Officer Flores reasonably believed he was engaged in the lawful performance of his duties, that he gave an order pursuant to those duties, that Plaintiff reasonably should have know that Officer Flores was a peace officer

19

1   engaged in his duties, and that Plaintiff willfully violated the order.  There was no

2   Fourth Amendment violation.

3       **B.    Officer Flores is also Entitled to Qualified Immunity**

4       The doctrine of qualified immunity shields a government official from liability

5   for monetary damages unless the plaintiff establishes "(1) that the official violated a

6   statutory or constitutional right, and (2) that the right was 'clearly established' at

7   the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, ___, 131 S.

8   Ct. 2074, 2080, 179 L. Ed. 2d 1149 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S.

9   800, 818, (1982)).

10      Courts have the discretion to decide which prong of this analysis to address

11  first under the circumstances of a particular case.  *Pearson v. Callahan*, 555 U.S.

12  223, 236 (2009).  A decision in the defendant's favor on either prong establishes

13  qualified immunity, even without consideration of the other prong.  *See Reichle v.*

14  *Howard*, ___ U.S. ___, 132 S. Ct. 2088, 2093 (2012); *C.F. ex rel. Farnan v.*

15  *Capistrano Unified Sch. Dist.*, 654 F.3d 975, 986 (9th Cir. 2011).

16      Here, Officer Flores has shown he had probable cause to arrest Plaintiff.

17  Thus, there was no unlawful arrest under the Fourth Amendment.  However, even if

18  one concludes probable cause was lacking, the circumstances of this case present a

19  textbook example of qualified immunity under the second prong of the test.

20      In order to violate clearly established law, "[t]he contours of the right must be

21  sufficiently clear that a reasonable official would understand that what he is doing

22  violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  While this

23  does not require a case directly on point, "existing precedent must have placed the

24  statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S.

25  731, ___, 131 S. Ct. at 2083.  The inquiry "must be undertaken in light of the

26  specific context of the case, not as a broad general proposition." *Saucier v. Katz*,

27  533 U.S. 194, 201 (2001).  It must be determined "whether it would be clear to a

28

20

reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202.

> Under qualified immunity, an officer is protected from suit when he or she "makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances." *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). The standard leaves "ample room for mistaken judgments." *Id.* at 343, 106 S.Ct. 1092.

*Lacey v. Maricopa County*, 649 F.3d 1118, 1131 (9th Cir. 2011).

Thus, even if an officer is mistaken about the existence of probable cause to arrest, the officer is still entitled to qualified immunity if the mistake was reasonable. *Krainski v. Board of Regents of Nevada System of Higher Education*, 616 F.3d 963, 969 (9th Cir. 2010) (citing *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1443 (9th Cir. 1991). "The protection of qualified immunity applies regardless of whether the government official's error is a 'mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

Here, Officer Flores' conclusion regarding probable cause was objectively reasonable, and Plaintiff cannot point to any well-established body of law stating that Officer Flores' exercise of his authority under California Vehicle Code section 2410, California Penal Code section 409.3, and California Health and Safety Code section 1798.6(c) was unlawful under the circumstances he confronted.[2] He reasonably concluded he was giving lawful orders, that the fire truck was posing an unnecessary safety risk, and that Plaintiff was refusing to follow those orders.

---

[2] Although qualified immunity is categorized as an affirmative defense, a plaintiff has the burden to demonstrate infringement of a "clearly established" right; if plaintiff fails to do so, defendant prevails. *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002) ("The plaintiff bears the burden of showing that the right at issue was clearly established under this second prong."); *Alston v. Read*, 663 F.3d 1094, 1098 (9th Cir. 2011) ("[Plaintiff] bears the burden of showing that the right at issue was clearly established."). Thus, it is Plaintiff Gregoire's burden to prove the infringement of a clearly established right.

21

MEMO. OF POINTS AND AUTHORITIES IN SUPPORT OF DEFS.' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION (14-cv-01749-GPC (DHB))

### III. OFFICER FLORES IS ALSO ENTITLED TO QUALIFIED IMMUNITY ON PLAINTIFF'S EXCESSIVE FORCE CLAIM

Plaintiff presumably basis his second cause of action for excessive force on authorities such as *Palmer v. Sanderson*, 9 F.3d 1433, 1436 (9th Cir. 1993), wherein the Court held that qualified immunity was not available for a claim by the plaintiff that he had been handcuffed so tightly as to cause pain and bruising for several weeks and that the officer refused to loosen the handcuffs. *See, also, Hansen v. Black*, 885 F.2d 642, 645 (9th Cir. 1989) [handcuffing performed in rough manner and left painful bruising requiring medical treatment].

Yet, Plaintiff admits he merely asked Officer Flores twice in a period of a couple of minutes before being placed in the car to loosen the handcuffs. (SSUMF, Fact 105.) He never stated that he told Officer Flores he was in any pain. Regardless, Plaintiff also admits there is no evidence of actual pain lasting more than a few minutes. He admits there were no injuries. (SSUMF, Facts 107 – 114.) Plaintiff admits that, other than his passing claim that the handcuffs were too tight, Officer Flores did not engage in any activity that appeared to be improper use of force. (SSUMF, Fact 115.) He was only in custody for approximately 30 minutes. (SSUMF, Fact 116.) Under these circumstances, it would not have been readily apparent to a reasonable officer that there was any excessive force.

### IV. PLAINTIFF'S CLAIM UNDER CALIFORNIA CIVIL CODE SECTION 52.1 IS WITHOUT MERIT BECAUSE THERE WAS PROBABLE CAUSE FOR HIS ARREST

Plaintiff's California Civil Code section 52.1 claim is based solely on an alleged violation of the Fourth Amendment's prohibition against unreasonable arrests. Having shown that he had probable cause for the arrest (see arguments in Section II(A) above), Officer Flores necessarily defeats the § 52.1 claim. *Reynolds v. County of San Diego*, 84 F.3d 1162, 1170-1171 (9th Cir. 1996) (*overruled on other grounds in Acri v. Varian Associates, Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997)).

## V. Plaintiff's Fourth Cause of Action for Battery is Without Merit, Because the Force used by Officer Flores was Reasonable and Justified

A state law battery claim is a counterpart to a federal claim of excessive use of force. In both, a plaintiff must prove that the peace officer's use of force was unreasonable. [Citation.] [Footnote omitted.] Claims that police officers used excessive force in the course of an arrest, investigatory stop or other seizure of a free citizen are analyzed under the reasonableness standard of the Fourth Amendment to the United States Constitution. [Citations.] The question is whether a peace officer's actions were objectively reasonable based on the facts and circumstances confronting the peace officer. [Citation.] The test is highly deferential to the police officer's need to protect himself and others. [Citation.]

*Brown v. Ransweiler*, 171 Cal. App. 4th 516, 527 (2009) (internal quotation marks omitted). *See also, Hayes v. County of San Diego*, 736 F.3d 1223, 1232 (9th Cir. 2013) ("Claims of excessive force under California law are analyzed under the same standard of objective reasonableness used in Fourth Amendment claims.") A battery claim against a peace officer requires the plaintiff to prove unreasonable force. *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1272 (1998).

Plaintiff Gregoire admits he never told Officer Flores he was encountering pain from the handcuffs, and he never actually suffered any significant pain or physical injuries from the handcuffs. Plaintiff admits that, other than the claim the handcuffs were too tight, Officer Flores did not engage in any improper use of force. (SSUMF, Facts 100 – 116.) Plaintiff fails to overcome Officer Flores' privilege under Penal Code section 835 to use "such restraint as is reasonable for his arrest and detention." Simple handcuffing is a routine incident of arrest.

## VI. Plaintiff's Claim for False Imprisonment is Without Merit, as the Arrest was Supported by Probable Cause

False imprisonment and false arrest are not separate torts under California law. *Collins v. City and County of San Francisco*, 50 Cal. App. 3d 671, 673 (1975) False imprisonment is "'the unlawful violation of the personal liberty of another.'" *Asgari v. City of Los Angeles*, 15 Cal. 4th 744, 757 (1997) (quoting *Fermino v. Fedco., Inc.*, 7 Cal. 4th 701, 715 (1994)). The confinement must be "'"without lawful privilege."'" *Id.* (quoting *Molko v. Holy Spirit Assn.* (1988) 46 Cal. 3d 1092,

23

1123.)  Yet, Officer Flores had the lawful privilege under California Penal Code sections 836(a) and 847(b).  Section 847(b)(1) precludes civil liability on the part of a peace officer for false imprisonment when, at the time of the arrest, the peace officer had probable cause to believe the arrest was lawful.  Under section 836(a)(1), a peace office may arrest a person without a warrant whenever '[t]he officer has probable cause to believe that the person to be arrested has committed a public offense in the officer's presence."  These provisions are analyzed under the same probable cause standard applicable in evaluating Fourth Amendment claims:

> "Probable cause for an arrest is shown if a man of ordinary caution or prudence would be led to believe and conscientiously entertain a strong suspicion of the guilt of the accused. [Citations.] Probable cause may exist even though there may be some room for doubt. [Citations.] .... The test in such a case is not whether the evidence upon which the officer made the arrest is sufficient to convict but only whether the prisoner should stand trial."

*Hamilton v. City of San Diego*, 217 Cal. App. 3d 838, 844 (1990) (quoting *People v. Fischer*, 49 Cal. 2d 442, 446 (1957)).

As Officer Flores demonstrated above in Section II(A) of this memorandum, there was probable cause for the arrest.  Thus, the false imprisonment claim fails.

## VII. PLAINTIFF'S CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS IS WITHOUT MERIT, BECAUSE OFFICER FLORES DID NOT ENGAGE IN OUTRAGEOUS CONDUCT

A required element of intentional infliction of emotional distress is extreme and outrageous conduct committed with the intent of causing, or reckless disregard of the probability of causing, emotional distress.  *Davidson v. City of Westminster*, 32 Cal. 3d 197, 209. (1982)  "Conduct to be outrageous must be so extreme as to exceed all bounds of that usually tolerated in a civilized community."  *Id.*

The facts of this case do not demonstrate extreme and outrageous conduct.  Officer Flores had substantial grounds for believing he had probable cause to arrest Engineer Gregoire.  (SSUMF, Facts 49 – 99.)  For the alleged excessive force, Plaintiff acknowledges that he never told Officer Flores he was encountering pain from the handcuffs and that he never actually suffered any physical injuries from

24

the handcuffs.  In addition, he admits that, other than the claim the handcuffs were too tight, Officer Flores did not engage in any improper use of force.  (SSUMF, Facts 100 – 115.)  He remained in custody approximately 30 minutes.  (SSUMF, Fact 116.)  There is no plausible showing of outrageous conduct.

## VIII. SINCE OFFICER FLORES IS NOT LIABLE ON THE STATE LAW TORT CLAIMS, THE STATE (CHP) IS ALSO NOT LIABLE

California Government Code section 815 abolished all common law claims against public entities.  Direct liability can only exist by way of statute.  *Miklosy v. Regents of University of California*, 44 Cal. 4th 876, 899 (2008).  Thus, to the extent that Plaintiff attempts to impose liability for his common law state claims against the State, it can only be by way of the vicarious liability provision of Government Code section 851.2.  However, having shown that Officer Flores is not liable for any of the state law claims, it necessarily follows that the State cannot be vicariously liable.  Also, where Officer Flores' conduct was privileged under Penal Code sections 836, 835, and 847, the State is also immune.  Gov. Code § 815.2(b).

## CONCLUSION

Defendants respectfully ask this Court to grant summary judgment in their favor on all of Plaintiff's claims.  Alternatively, Defendants seek summary adjudication for each claim on which Plaintiff fails to raise a material dispute.

Dated:  November 23, 2015

Respectfully Submitted,

KAMALA D. HARRIS
Attorney General of California
RICHARD F. WOLFE
Supervising Deputy Attorney General

s/DOUGLAS E. BAXTER
DOUGLAS E. BAXTER
Deputy Attorney General
*Attorneys for Defendants State of California (by and through the California Highway Patrol) and Sergio Flores*

SD2014707454
81199901.doc

25

MEMO. OF POINTS AND AUTHORITIES IN SUPPORT OF DEFS.' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION (14-cv-01749-GPC (DHB))