1  KAMALA D. HARRIS
   Attorney General of California
2  RICHARD F. WOLFE
   Supervising Deputy Attorney General
3  DOUGLAS E. BAXTER
   Deputy Attorney General
4  State Bar No. 201351
    600 West Broadway, Suite 1800
5   San Diego, CA 92101
    P.O. Box 85266
6   San Diego, CA 92186-5266
    Telephone:  (619) 645-2034
7   Fax:          (619) 645-2012
    E-mail:  Douglas.Baxter@doj.ca.gov
8  *Attorneys for Defendants State of California*
   *(by and through the California Highway*
9  *Patrol) and Sergio Flores*

10              **IN THE UNITED STATES DISTRICT COURT**

11           **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

12

13 | JACOB GREGOIRE,                          | Case No.: 14-cv-01749-GPC (DHB)
14 |                              Plaintiff,  | **DECLARATION OF DOUGLAS E.**
15 |      v.                                  | **BAXTER IN SUPPORT OF**
   |                                          | **DEFENDANTS' MOTION FOR**
16 |                                          | **SUMMARY JUDGMENT OR, IN**
   |                                          | **THE ALTERNATIVE, SUMMARY**
17 | CALIFORNIA HIGHWAY PATROL,               | **ADJUDICATION OF CLAIMS**
   | an agency of the State of California;    |
18 | SERGIO FLORES, and DOES 1 to 20,         | Date:         January 29, 2016
   |                                          | Time:         1:30 p.m.
19 |                            Defendants.   | Courtroom: 2D
   |                                          | Judge:        The Honorable Gonzalo P.
20 |                                          |               Curiel

21       I, Douglas E. Baxter, hereby declare as follows:

22       1.  I am an attorney duly licensed to practice law in the State of California.  I

23  am authorized to appear before the United States District Court for the Southern

24  District of California.  I am employed as a Deputy Attorney General for the Office

25  of the Attorney General of the State of California.  I am assigned to represent

26  Defendants State of California (by and through the California Highway Patrol) and

27  Sergio Flores in the above-entitled action.

28
                                         1

2.  I conducted the September 16, 2015, deposition of Plaintiff Jacob Gregoire in this action.  Attached herewith as Exhibit A are true and correct copies of those excerpts of the certified transcript of Plaintiff's deposition and exhibits to said transcript that are referenced in Defendants' Separate Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment, or, in the Alternative, Summary Adjudication.

3.  I conducted the September 10, 2015, deposition of Captain David L. Albright in this action.  Attached herewith as Exhibit B are true and correct copies of those excerpts of the certified transcript of Captain Albright's deposition and exhibits to said transcript that are referenced in Defendants' Separate Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment, or, in the Alternative, Summary Adjudication.

I affirm under penalty of perjury under the laws of the State of California that the foregoing information is true and correct of my own knowledge and that this declaration is being executed on this 23rd day of November at San Diego, California.

s/DOUGLAS E. BAXTER
Douglas E. Baxter

SD2014707454
81202958.doc

2

DECL. OF DOUGLAS E. BAXTER IN SUPPORT OF DEFS.' MOTION FOR SUMMARY
JUDGMENT OR SUMMARY ADJUDICATION  (14-cv-01749-GPC (DHB))

**EXHIBIT A**


HUTCHINGS
Litigation
SERVICES

# CERTIFIED COPY

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

————————————————————  )
                                              )
JACOB GREGOIRE,                )
                                              )
             Plaintiff,              ) CASE NO.
                                              )
        v.                               ) 14-CV-01749-GPC (DHB)
                                              )
CALIFORNIA HIGHWAY PATROL, an )
agency of the State of California; )
SERGIO FLORES; and DOES 1 to 20, )
                                              )
             Defendants.          )
————————————————————  )

VIDEOTAPED DEPOSITION OF JACOB GREGOIRE

SAN DIEGO, CALIFORNIA

SEPTEMBER 16, 2015

REPORTED BY JULIA LENNAN, RPR, CSR NO. 12843

HUTCHINGS NUMBER: 588449

1        IN THE UNITED STATES DISTRICT COURT

2       FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4   _____)
                                    )
    JACOB GREGOIRE,                 )
5                                   )
              Plaintiff,            )  CASE NO.
6                                   )
         v.                         )  14-CV-01749-GPC (DHB)
7                                   )
    CALIFORNIA HIGHWAY PATROL, an   )
8   agency of the State of California; )
    SERGIO FLORES; and DOES 1 to 20, )
9                                   )
              Defendants.           )
10  _____)

11

12

13

14

15

16

17

18

19

20       VIDEOTAPED DEPOSITION OF JACOB GREGOIRE,

21  taken on behalf of Defendants at 1320 Columbia Street,

22  Suite 200, San Diego, California, on Wednesday,

23  September 16, 2015, at 9:31 a.m., before Julia Lennan,

24  RPR, CSR, No. 12843, a certified shorthand reporter in

25  the state of California.

GREGOIRE - 9/16/2015

```
 1    APPEARANCES:

 2    For Defendants:

 3            Attorney General of California
              By:  Douglas E. Baxter
 4            600 West Broadway, Suite 1800
              San Diego, California  92101
 5            619.645.2034
              douglas.baxter@doj.ca.gov
 6
 7    For Plaintiff:

 8            Law Office of Steve Hoffman
              By:  Steve Hoffman
 9            1320 Columbia Street, Suite 200
              San Diego, California  92101
10            619.577.3015
              shoffmanlaw@gmail.com
11
                          - and -
12
              The Gilleon Law Firm
13            By:  Daniel M. Gilleon
              1320 Columbia Street, Suite 200
14            San Diego, California  92101
              619.702.8623
15            dmg@mglawyers.com

16

17    Also Present:

              Anthony Martinez, Videographer
18

19

20

21

22

23

24

25
```

GREGOIRE - 9/16/2015

```
 1            THE VIDEOGRAPHER:  We are on the record.  The
 2   time is 9:31 a.m.  The date is September 16th, 2015.
 3            This is the beginning of Media Number 1 in the
 4   deposition of Jacob Gregoire, Volume 1, taken by the
 5   defense in the matter of Jacob Gregoire versus
 6   California Highway Patrol.  The Case Number is
 7   14-CV-01749-GPC (DHB).
 8            This deposition is being held at 1320 Columbia
 9   Street, suite 200, San Diego, California, 92101.  The
10   court reporter is Julia Lennan.  I am Anthony Martinez,
11   the videographer retained by Hutchings Video &
12   Litigation Services, 400 North Tustin Avenue, Suite 301,
13   Santa Ana, California, 92705.
14            This deposition is being videotaped at all
15   times unless specified to go off the record.
16            Will all present please identify themselves
17   beginning with the witness.
18            THE WITNESS:  Present.
19            THE COURT REPORTER:  Identify yourself.
20            THE WITNESS:  Oh, sorry.  Jacob Gregoire.
21            MR. HOFFMAN:  Steve Hoffman on behalf of Jake
22   Gregoire.
23            MR. GILLEON:  Dan Gilleon.
24            MR. BAXTER:  Doug Baxter for the State of
25   California.
```

GREGOIRE - 9/16/2015

Page 6

1          THE VIDEOGRAPHER:  Thank you.  Will the

2    witness be sworn in.  Then we can proceed.

3

4                   JACOB GREGOIRE,

5      having been first duly sworn, testifies as follows:

6

7                   EXAMINATION

8    BY MR. BAXTER:

9          Q     Thank you, Mr. Gregoire.

10               Am I pronouncing your last name correctly?

11         A     Yes.  Gregoire.  Close enough.

12         Q     Good as anybody gets it.

13         A     That's okay.

14         Q     If you could just start off by stating and

15    spelling your full name for the record.

16         A     Yes.  It's Jacob Gregoire, J-a-c-o-b,

17    G-r-e-g-o-i-r-e.

18         Q     Thank you.

19               As I mentioned, I'm with the State of

20    California.  I represent the California Highway Patrol

21    and Officer Sergio Flores regarding the lawsuit that you

22    have filed in relation to the February 4, 2014, incident

23    that took place on the 805 freeway.  I just want to go

24    over kind of some ground rules of what we're doing here

25    today.

GREGOIRE - 9/16/2015

1       A       No.

2       Q       Okay.   You said you noticed an ambulance.

3               Where did you notice an ambulance at?

4       A       Parked in the center divide.

5       Q       Could you tell whether that ambulance had any

6    emergency lights activated?

7       A       Yes.

8       Q       And what did you notice?

9       A       It had its lights on.

10      Q       We've heard in the industry Code 3, Code 2

11   lights.

12              How would you -- how would you describe the

13   type of lights it had on?

14      A       It would -- to the best of my memory, a Code 2

15   would be lights with no siren.

16      Q       Okay.

17      A       Since it's not moving at the time, I don't

18   think -- believe they had their siren on.

19      Q       Okay.   But do you think they had full reds,

20   blues --

21      A       Yes.

22      Q       -- everything going on?

23      A       Typically on our apparatus, it's one switch

24   that turns them all on.

25      Q       Okay.   But I'm trying to find out what you

GREGOIRE - 9/16/2015

Page 26

```
 1      recall seeing on the ambulance, what was activated.
 2          A      The same thing for the ambulance.
 3          Q      All right.  And you had your full code lights
 4      on?
 5          A      Correct.
 6          Q      All right.  And where did you park your
 7      vehicle in relation to that ambulance?
 8          A      In the Number 1 lane roughly 50 -- 25 to
 9      50 feet behind it.
10          Q      At that point could you see any other fire
11      engines from any other agency on the scene?
12          A      No.
13          Q      All right.  At that point were you aware of
14      whether there were any other CHP vehicles already
15      stopped at the scene?
16          A      No.
17          Q      Okay.  And you mentioned the ambulance was
18      parked in the center divide?
19          A      Yes.
20          Q      Okay.  And can you describe the layout of --
21      well, actually, where you parked was there any shoulder?
22          A      No.
23          Q      And that, I mean a shoulder on the inside of
24      the freeway.
25          A      No, it was not much.  There was a K-rail
```

GREGOIRE - 9/16/2015

1    there, a temporary K-rail, from the construction zone.

2        Q    So that was abutting right up against the

3    Number 1 lane?

4        A    Yes.

5        Q    Did your vehicle pass the end of that K-rail

6    at all where the K-rail terminated, or were you still

7    K-rail from front to back of your vehicle?

8        A    I'd have to review some video or photos.  I

9    don't recall exactly how far away the engine was from

10   the K-rail.

11       Q    All right.  To the best of your recollection,

12   the -- there was a center divide where the ambulance

13   was.

14            Does that mean the K-rail ended at some point,

15   that the ambulance was able to go into a center divide

16   area?

17       A    Correct.

18       Q    All right.  Was any part of the ambulance in

19   the Number 1 lane?

20       A    I don't recall.  If they weren't, they were

21   very close to it.

22       Q    All right.  Could you tell if the ambulance

23   was parked at an angle with respect to the K-rail, or

24   did it appear to be parallel to the K-rail?

25       A    I don't recall exactly.

GREGOIRE - 9/16/2015

Page 34

1    A    I walked maybe 10 or 15 feet kind of just

2    behind the wrecked vehicle with my flashlight and just

3    eyeballed everything just kind of as quick as -- a brief

4    quick overview.

5        Q    Did you nice any ejected patients?

6        A    I did not.

7        Q    All right.  Did you do anything at that point

8    to assess the vehicle as to whether there was still any

9    apparent fire hazard from that vehicle?

10       A    Other than visually looking at it and had

11   climbed around it, no, I did not notice any fire.

12       Q    Is that part of your respons- -- normal

13   responsibilities as a fire engineer, to try to make that

14   assessment when you first get on scene?

15       A    It's not a desig- -- necessarily a designated

16   responsibility, but it is something that I do.

17       Q    And so did you notice any smoke coming from

18   the vehicle?

19       A    I do not recall any, no.

20       Q    Okay.  Did you notice -- did the vehicle

21   appear to be stationary?

22       A    Yes.

23       Q    Was it still spinning or anything?

24       A    No.

25       Q    All right.  Did you see any sparking coming

GREGOIRE - 9/16/2015

1   from the vehicle anywhere?

2        A    I do not recall any sparking.

3        Q    Did you make any observations in the immediate

4   vicinity of the vehicle of any leaking hazardous fluids

5   coming from the vehicle such as gasoline?

6        A    Right.  I didn't -- I do not recall seeing any

7   leaking fluids.

8        Q    Okay.  Was there anything about that vehicle

9   based on your training and experience as a fire engineer

10  with the Chula Vista fire department, that led you to

11  believe at that point that that vehicle appeared likely

12  to catch on fire?

13            MR. HOFFMAN:  Objection.  Vague and ambiguous

14  as to "likely."

15  BY MR. BAXTER:

16       Q    Well, were you concerned that the -- as your

17  role, that you needed to do something because that

18  vehicle appeared at risk of catching fire?

19       A    Based on experience, my judgment at the time

20  was no, it would not, but anything could happen.

21       Q    All right.  Did you feel a need to go retrieve

22  any fire extinguishers at that point?

23       A    I did not.

24       Q    Did you feel a need to go pump up the engine's

25  water lines?

1            There's copies for counsel.  I thought I had a

2    fourth one.

3            (Exhibit 3 marked.)

4    BY MR. BAXTER:

5        Q    First of all, let me ask you, do you recognize

6    anything depicted in that photo?

7        A    Yes.

8        Q    What all do you recognize in terms of -- do

9    you recognize any of the people there?

10       A    Yes.

11       Q    Who do you recognize?

12       A    Myself, Mr. Flores, and John McClintock.

13       Q    All right.  Where are you -- describe where

14   you are in this picture.

15       A    I'm on a closed off freeway lane surrounded by

16   two K-rails.

17       Q    Okay.  And is that Officer Flores behind you?

18       A    To the best of my knowledge, yes.

19       Q    That's the officer that ultimately arrested

20   you, though?

21       A    Yes.

22       Q    And so you are the one standing immediately in

23   the forefront of this picture?

24       A    Correct.

25       Q    And you said Captain McClintock?

GREGOIRE - 9/16/2015

Page 48

```
 1        A    Yes.

 2        Q    Is he the one over to the far -- as you're

 3    facing the picture, the far right?

 4        A    Yes.

 5        Q    Appears to have like a ball cap on?

 6        A    Yes.

 7        Q    And his yellow jacket is open and you can see

 8    blue?

 9        A    Yes.

10        Q    All right.  Is Captain McClintock from Chula

11    Vista?

12        A    Yes.

13        Q    All right.  Do you know what engine?

14        A    Engine 54.

15        Q    All right.  Now, at this instant I understand

16    that you're not going to know exactly where -- the

17    sequence of this news video, but does this picture

18    appear to fairly and accurately depict events that you

19    recall happening at that night?

20        A    Yes.

21        Q    Now, you see a K-rail taken from your vantage

22    point facing forward.

23             Would you know -- can you tell which direction

24    you were facing at that point?

25        A    In the photo I was facing southbound.
```

GREGOIRE - 9/16/2015

```
 1         Q    All right.  So from that vantage point, to
 2    your right do you see a K-rail?
 3         A    Yes.
 4         Q    All right.  Would that be on the southbound
 5    side?
 6         A    Yes.
 7         Q    All right.  And then so to your immediate left
 8    and to Captain McClintock's immediate right, there's
 9    another K-rail.
10         A    Correct.
11         Q    Is Captain McClintock standing in the
12    northbound lanes at that instant?
13         A    No.  He's in another construction zone.
14         Q    All right.  And at that instant do you believe
15    Captain McClintock -- you can't see it in this photo,
16    but he -- the nearby -- the rollover car is nearby in
17    the area where Captain McClintock is standing?
18         A    Yes.
19         Q    Okay.  And can you kind of see far back in the
20    background there's a green sign?
21         A    Yes.
22         Q    Are you able to see another K-rail line back
23    there?
24         A    It's hard to tell, but it's possible.
25         Q    All right.  But to the best of your
```

GREGOIRE - 9/16/2015

Page 50

1    recollection, there was a third K-rail line that

2    demarcated the edge of the northbound lanes over to

3    Captain McClintock's left from where he's facing?

4        A    Yes.

5        Q    All right.  So now based on the vantage point

6    of this picture, would it be correct to say that your

7    fire engine is somewhere off to your right and south of

8    you at that point?

9        A    Yes.

10       Q    All right.  So the rollover vehicle, there

11   would be the southbound K-rail and this open lane that's

12   under construction and then another K-rail before you

13   get to the rollover vehicle if you were walking from the

14   southbound lanes, correct?

15       A    Yes.

16       Q    All right.  And having looked at that, that

17   refreshes your recollection as to kind of how the

18   K-rails were laid out?

19       A    Yes.

20            MR. BAXTER:  All right.  Let me show you

21   another picture that I'm going to mark as Exhibit 4.

22            (Exhibit 4 marked.)

23   BY MR. BAXTER:

24       Q    If you could look at Exhibit 4.

25            Does this depict a portion of the scene of the

GREGOIRE - 9/16/2015

Page 51

```
 1    events from that evening?

 2        A    Yes.

 3        Q    All right.  Facing the picture, the officer to

 4    our left as we face the picture, that's the officer that

 5    arrested you?

 6        A    Yes.

 7        Q    And he's got his arm and that's touching

 8    somebody.

 9             That's you, correct?

10        A    Yes.

11        Q    So that would have been in seconds of you

12    crossing over that K-rail to come to him?

13        A    Yes.

14        Q    All right.  Now, in that picture you can

15    actually see the rollover car, correct?

16        A    Correct.

17        Q    All right.  And that's where it was throughout

18    that evening?

19        A    Yes.

20        Q    Okay.  And do you see some other firefighter

21    personnel?

22        A    Yes.

23        Q    The area where they're all standing, is that

24    where the patient care was occurring?

25        A    Correct.
```

GREGOIRE - 9/16/2015

1    that were mostly one-sided on the way back.

2        Q    All right.  At the point that -- did you

3    ever -- prior to going over to look at the vehicle, did

4    you ever activate any lighting on Engine 52 to help

5    illuminate the patient care scene?

6        A    No.

7        Q    All right.  Prior to the point where you're

8    arrested, were you aware of whether any other fire

9    apparatus were -- had activated any halogens or other

10   types of lights to help illuminate the patient-care

11   scene?

12       A    At the time I wasn't aware of it, but after

13   reviewing the videos, I see that Engine 54 was in the

14   process of setting up lights.

15       Q    All right.  Prior to the point where you're

16   arrested, were you -- and your -- you -- I guess what

17   I'm trying to understand, were you aware of whether

18   those lights had already been activated and were

19   illuminating the scene?

20       A    No.

21       Q    Okay.  What happened next as he handcuffs you?

22       A    He -- we began -- I was handcuffed, and we

23   began walking back to his car.

24       Q    Okay.  And how did you -- what path did you

25   walk back to his car?

GREGOIRE - 9/16/2015

Page 70

1          A     The -- down the middle of the -- in between
2     the two K-rails.
3          Q     So if we look at a picture, say, Exhibit 3 --
4          A     Yes.  We turned, and I basically essentially
5     did a 180 degrees to where we were standing and walked
6     back.
7          Q     All right.  How far did you -- did he walk you
8     to his car?
9          A     Yes.
10         Q     Where was his car parked?
11         A     About roughly a hundred yards or so back from
12    there.
13         Q     All right.  Do you know where it was -- was it
14    on the southbound side?
15         A     Yes, Number 1 lane.
16         Q     All right.  At this point did you notice any
17    flare patterns in the lanes?
18         A     I did -- I do not recall seeing flares.
19         Q     All right.  Did you walk all the way back to
20    his car between those two K-rails?
21         A     Yes, until we got -- towards the front of his
22    car we climbed over or we -- I think the -- I can't
23    recall if there was an opening we walked through or if
24    we climbed over.
25         Q     All right.  All right.  At this point did you

GREGOIRE - 9/16/2015

1    say -- during that walk down to the car before you

2    crossed back over the K-rails to go to his car on the

3    southbound side, did you -- two of you discuss anything?

4        A   Yes.  I mentioned to him -- I said, "Can we

5    talk this out and work this out?"

6          And he kind of chuckled and said, "No, you

7    already had your chance."

8          MR. BAXTER:  Not blocking the camera?

9          THE VIDEOGRAPHER:  (Shakes head).

10   BY MR. BAXTER:

11        Q   Anything else that was said between the two of

12   you?

13        A   That was it at that point.

14        Q   All right.  All right.  And then what happened

15   once you crossed the K-rails?

16        A   Once we crossed the K-rails, he walked me to

17   the passenger side in the Number 2 lane, which was open

18   with traffic -- cars were swerving out of the way -- and

19   he began going through my pockets.

20        Q   Were you -- you were standing on the passenger

21   side?

22        A   Passenger side of his vehicle, towards the

23   front passenger quarter panel of his vehicle, being

24   searched in the Number 2 lane.

25        Q   Okay.  And then what happened?

GREGOIRE - 9/16/2015

Page 72

1        A    I asked him if we could please move to the

2   other side of the vehicle and that I would tell him

3   everything I had in my pockets and that I was

4   cooperating, and he obliged.

5        Q    All right.  So the two of you moved to the --

6        A    To the front of the vehicle, I believe.

7        Q    All right.  And did he continue searching you

8   at that point?

9        A    Yes.

10        Q    All right.  How long did that process of

11   searching you last?

12        A    I don't recall.  Maybe a minute or so.

13        Q    All right.  And at this point had you made any

14   complaints about the handcuffs?

15        A    At this point, no.

16        Q    All right.  What happened next?

17        A    Well, when we were to the side of the vehicle,

18   I asked him if he could loosen the handcuffs.

19        Q    When -- after he was done searching you?

20        A    Yes, before he was putting me in the car.

21        Q    All right.  And what, if anything, did he say

22   in response?

23        A    He tightened them.

24        Q    How did he do that?

25        A    I'm not familiar with how handcuffs work, but

GREGOIRE - 9/16/2015

1    they got tighter on my wrists.  So that's how -- that

2    was his response.

3        Q    Did he -- did you see him take out a key or

4    anything to tighten them?

5        A    He was standing behind me.

6        Q    All right.  Did you feel his wrists go around

7    your wrists as he's tightening them or --

8        A    The handcuffs just got tighter.  They weren't

9    his wrists because they were tighter and they stayed

10    tighter until I got out of the car.

11        Q    Okay.  And how long were you in the car for?

12        A    30 to 40 minutes.

13        Q    All right.  Did he get in the car with you at

14    any time?

15        A    Yes.

16        Q    Okay.  How soon after putting you in the car

17    did he get in the car?

18        A    Couple minutes.

19        Q    All right.  And as you are in the car, did you

20    have any conversations with him?

21        A    He was -- he asked me some personal questions

22    and I answered them.

23        Q    What do you mean by personal questions?

24        A    Asked me my name, how to spell it, and my

25    address, and -- I have it written down here as well --

GREGOIRE - 9/16/2015

Page 74

1  maybe my phone number.  I can't remember at the time

2  exactly what he asked me, and then I -- at the

3  conclusion of that, I asked him what I was being

4  arrested for.

5      Q    **And what, if anything, did he say?**

6      A    148.

7      Q    **Anything else?**

8      A    Nope.  I asked -- until I ask what a 148 was.

9      Q    **And what did he say?**

10      A    He said obeying, I believe.  Obeying.

11      Q    **All right.**

12      A    I said -- and then -- and then after that he

13  said, "I don't know.  I have to talk to my supervisor."

14      Q    **All right.  During this time that you're**

15  **having conversations, did you make any further**

16  **complaints about the handcuffs being too tight?**

17      A    No.  Just right before I got in, I asked him

18  one more time, "Can you please loosen the handcuffs."

19      Q    **All right.  Did he ever say anything like,**

20  **"No, I'm not going to loosen them"?**

21      A    No, he just ignored me.

22      Q    **Okay.  Did he say anything like, "I'm going to**

23  **tighten them"?**

24      A    Nope.

25      Q    **All right.  At some point you got out of the**

GREGOIRE - 9/16/2015

1    handcuffs?

2        A    When he let me out of the car.

3        Q    All right.  Did you have any marks on your

4    wrists after that?

5        A    I did not check my wrists.  I don't know.  I

6    don't recall.

7        Q    So from the time you were released from the

8    handcuffs to the next morning, did you ever check your

9    wrists to look for marks?

10        A    I don't recall looking at my wrists.  I was --

11    I think I was too busy with other stuff.

12        Q    All right.  Did you ever take any photographs

13    of your wrists at any point for purposes of documenting

14    any marks --

15        A    I did not.

16        Q    All right.  If I can just finish.

17        A    Sorry.

18        Q    Did you ever take any photographs from the

19    date -- the time you were released up to today to

20    document any marks that you believe to have been left on

21    either of your wrists from the handcuffs being too

22    tight?

23        A    I did not.

24        Q    Did you ever seek any medical care from any

25    type of medical provider for treatment for injuries that

GREGOIRE - 9/16/2015

Page 76

1    you attribute to the handcuffs?

2          A    I did not.

3          Q    All right.  Did anyone ever -- did you ever

4    show your wrists to anyone after the point of being

5    released to say, "Hey, look, I've got marks from the

6    handcuffs"?

7          A    I do not recall doing so.

8          Q    All right.  Were you in pain for a period of

9    time after the handcuffs were taken off, in your wrists?

10         A    I think they were sore on my walk back, but I

11   had a lot of adrenaline going on from what had just

12   happened, so I may have put it out of my mind at that

13   time.  It was just a relief to have them off.

14         Q    All right.  Were you sore the next morning

15   when you woke up on your wrists at all?

16         A    I don't recall being so.

17         Q    Okay.  Since the time you've been released

18   from the handcuffs up to today, have you ever

19   experienced any pain in your wrist area where the

20   handcuffs were?

21         A    No.

22         Q    On either wrist?

23         A    No.

24         Q    All right.  Any abrasions left by the

25   handcuffs?

GREGOIRE - 9/16/2015

Page 86

1    medical training do you have?

2        A    An EMT.

3        Q    An EMT, and that requires some sort of

4    licensing?

5        A    Yes.

6        Q    All right.  When did you get that licensing?

7        A    I got it, I don't remember, the summer of 2000

8    I believe.

9        Q    All right.  Now, in the course of your

10   training and experience to get that licensing and the --

11   your on-the-job training and experience with the fire

12   department, do you have an understanding as to whether

13   or not a paramedic and EMT, one is a higher level of

14   care?

15       A    Yes.

16       Q    What is your understanding?

17       A    That the paramedic is a higher level of care.

18       Q    All right.  With this particular incident, the

19   paramedics from AMR were already on scene prior to the

20   point that you arrived, correct?

21       A    Correct.

22       Q    All right.  As the higher level of care based

23   on your training and experience, between Chula Vista

24   Fire Department and those AMR paramedics, who had the

25   authority for patient care decision making between the

GREGOIRE - 9/16/2015

Page 96

1      A     According to the photos, it appears that way.
2  I do not recall the exact layout of the people.
3      Q     All right.  And I'm not asking for the exact
4  layout.  I'm just asking for whether or not when that
5  paramedic said, "I need help with the gurney," whether
6  those other Chula Vista Fire Department personnel and
7  other paramedics or AMR personnel were present?
8      A     I do not recall.  I feel like the question or
9  this -- the request was directed to me.
10     Q     And why do you feel like it was directed to
11 you?
12     A     Because it was just a -- the way I felt, the
13 way it sounded.
14     Q     Okay.  But you don't recall that person
15 specifically face to face with you when they said that?
16     A     We were not face to face.
17     Q     Okay.  You don't recall him looking you in the
18 eye and saying that?
19     A     I don't recall.
20     Q     All right.  And other personnel were around
21 you when he said that?
22     A     I don't remember exactly, but referring to
23 your photos, it's possible.
24         MR. BAXTER:  All right.  I'm going to show you
25 a photo that I'm marking as Exhibit 8.

GREGOIRE - 9/16/2015

```
 1              (Exhibit 8 marked.)
 2    BY MR. BAXTER:
 3         Q    If you could look at that and tell me whether
 4    that depicts any of the events from this incident?
 5         A    Yes.
 6         Q    All right.  I know the majority of the people
 7    are facing the other direction, but are you able to see
 8    yourself in that picture anywhere?
 9         A    Yes.
10         Q    Can you take this red pen and put an "X" on
11    the person you believe to be you on somewhere where
12    it'll show up.
13         A    Yes (indicating).
14         Q    All right.
15              MR. HOFFMAN:  Okay.
16    BY MR. BAXTER:
17         Q    And you feel comfortable just -- even though
18    that person is facing the other direction, you feel
19    certain that's you?
20         A    It's a -- I'm pretty comfortable to say yes,
21    it is.
22         Q    Is that where you recall standing at one
23    point?
24         A    Yes.
25         Q    And what do you believe you were doing at that
```

GREGOIRE - 9/16/2015

Page 98

1    point?

2         A    At that point I was lighting the gurney, and I

3    had taken a step back from the gurney and was looking

4    over my shoulder to find out who was yelling at me.

5         Q    All right.  And there's somebody in a fire

6    department uniform to your left from the vantage point

7    of that person.

8              Who's that?  Can you tell?

9         A    I cannot tell.

10        Q    Okay.  Could that have been

11   Captain McClintock?

12             MR. HOFFMAN:  Objection.  Calls for

13   speculation.

14             THE WITNESS:  It could have been.

15   BY MR. BAXTER:

16        Q    Well, do you remember Captain McClintock being

17   in that general area around the point that's being

18   depicted in this photograph?

19        A    My memory, I do not remember, but according to

20   the photos, it appears as though he was.

21        Q    All right.  And I know you can only see part

22   of the right shoulder and like a lower right leg of what

23   appears to be a tan firefighter outfit to your immediate

24   right from your vantage point in this photo.

25        A    Yes.

GREGOIRE - 9/16/2015

1      Q      Do you believe that to be another Chula Vista

2  fire personnel?

3      A      Unknown on the agency, but firefighter

4  personnel.

5      Q      Okay.  So either San Diego or Chula Vista?

6      A      Yes.

7      Q      All right.  And to the right of that, you see

8  a CHP officer?

9      A      Yes.

10      Q      And then kneeling there's an AMR paramedic or

11  personnel?

12      A      Yes.

13      Q      And then you have a patient on the ground?

14      A      Yes.

15      Q      And then there's a firefighter facing our

16  direction that appears to be partially kneeling,

17  correct?

18      A      Correct.

19      Q      Are you able to tell from this photo who that

20  might be?

21      A      I believe it's Fire Paramedic Andy Matthews.

22      Q      Okay.  Why do you believe that?

23      A      Because he was the firefighter on Engine 54

24  that night.

25      Q      All right.  Is there anything special about

GREGOIRE - 9/16/2015

Page 152

1    A    Yeah.  I believe due to lack of sleep, just
2  achiness and, you know, stiffness of my body.
3    Q    All right.  Have you been taking any
4  medications like painkillers to treat that that you
5  weren't taking before the incident?
6    A    I would -- whenever -- I guess whenever I'm
7  sore or stiff, I might take some Advil or some Tylenol
8  but not on a regular basis.
9    Q    All right.  Do you believe that you suffered
10  any physical injuries as a result of this incident to
11  any part of your body?
12    A    No.
13    Q    Okay.  Did anything about the process of
14  Officer Flores -- when he first made physical contact
15  with you to the point where you were released from the
16  vehicle and let go, did anything cause you any sort of
17  physical injuries that you attribute to that incident?
18    A    Physical, no.
19        MR. BAXTER:  All right.  Can we just take a
20  break for like five minutes?
21        MR. HOFFMAN:  Sure.
22        THE VIDEOGRAPHER:  Going off the record.  Time
23  is 12:38 p.m.
24        (Recess.)
25        THE VIDEOGRAPHER:  We are back on the record.

GREGOIRE - 9/16/2015

1      A      With his verbal statement as I was getting out

2   of the vehicle.  I didn't know how to accept it.  It was

3   threatening, and I'm not sure if there was harm behind

4   it or not.

5      Q      **What statement are you referring to?**

6      A      When I got out of the car, he said, "This is

7   not over yet.  You are not being arresting, but I am not

8   done with you."

9      Q      **All right.**

10     A      "You're going to have to answer for your

11  actions."

12     Q      **All right.  And that's the only statement he**

13  **made to you at that point?**

14     A      And then he said something about, "Don't --

15  you have to fill out some paperwork before you leave."

16     Q      **All right.  Other than that statement, are you**

17  **aware of any other statements he made that appear to**

18  **say, "I'm going to hit you," anything like that?**

19     A      Verbally, no.

20     Q      **All right.  Did he make any gestures that**

21  **appeared to you that he was going to strike you in any**

22  **way?**

23     A      Strike, no, but strai- -- or tightening the

24  handcuffs felt -- was threatening.

25     Q      **Okay.  So you talked about what you felt was**

GREGOIRE - 9/16/2015

Page 158

1    tightening the handcuffs.

2         Did he do anything else that you said -- that

3    you believed to be improperly using force?

4         A    No.

5         Q    Okay.  And you already said that no part of

6    your body was hurt as a result of this arrest?

7         A    Correct.

8         Q    Okay.  Physically hurt.

9         A    Physically, correct.

10             MR. BAXTER:  Okay.  All right.  All right.  I

11   believe that's all I have.

12             Do you have any questions or --

13             MR. HOFFMAN:  One question.

14

15                      EXAMINATION

16   BY MR. HOFFMAN:

17        Q    Jake, you said previously -- I'm just trying

18   to clarify where you recall the ambulance being parked.

19   You said it was at one point in the center divider.

20             How far away from the edge of Lane 1 was the

21   back of the ambulance?

22        A    It was right -- right next to Lane 1 as far as

23   I can -- it was roughly 25 or so feet -- 25 to 50 or so

24   feet past the end of that open K-rail on the shoulder

25   inches from the first lane, the Lane 1, as far as I can

GREGOIRE - 9/16/2015

Page 164

```
1    STATE OF CALIFORNIA   )
                            )
2    COUNTY OF SAN DIEGO   )

3

4         I, Julia Lennan, a certified shorthand reporter for

5    the State of California, CSR No. 12843, registered

6    professional reporter, do hereby certify:

7         That the witness in the foregoing deposition was

8    first duly sworn by me to testify to tell the truth in

9    the foregoing cause; that the deposition was taken

10   before me at the time and place herein named; that the

11   said deposition was reported stenographically by me and

12   transcribed through computer-aided transcription under

13   my direction; and that the foregoing is a true record of

14   the testimony elicited.

15        I do further certify that I am in no way interested

16   in the outcome of this action or connected with or

17   related to any of the parties or to their respective

18   counsel.

19        In witness whereof, I have hereunto set my hand

20   this 21st day of September, 2015.

21

22        _____

23        JULIA LENNAN, RPR, CSR NO. 12843

24

25
```

# Jacob Gregoire

## Gregoire vs. California Highway Patrol



**Job: 268078**                                                    **Exhibit: 00003**

  



TRACK _____ EXHIBIT 3
DATE 9-16-15
WITNESS Gregoire
1 PAGES(S)
JULIA LENNAN, CSR #12843

# Jacob Gregoire

## Gregoire vs. California Highway Patrol



**Job: 268078**

**Exhibit: 00004**

  



TRACK _____ EXHIBIT _4_
DATE __9-16-15__
WITNESS __Gregoire__
_____ PAGES(S)
JULIA LENNAN, CSR #12843

# Jacob Gregoire

## Gregoire vs. California Highway Patrol



**Job: 268078**

**Exhibit: 00008**

  



TRACK _____ EXHIBIT 8
DATE 9-16-15
WITNESS Gregoire
_____ PAGES(S)
JULIA LENNAN. CSR #12843

**EXHIBIT B**



CERTIFIED
COPY

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

JACOB GREGOIRE,                          )

        Plaintiff,                       )

   vs.                                   ) Case No.:

CALIFORNIA HIGHWAY PATROL, an            ) 14-cv-01749-GPC (DHB)

agency of the State of                   )

California; SERGIO FLORES, and           )

DOES 1 to 20,                            )

        Defendants.                      )

_____  )


VIDEO DEPOSITION OF DAVID L. ALBRIGHT

San Diego, California

September 10, 2015


REPORTED BY:  KIMBERLY A. BROADHURST, CSR NO. 13814

Hutchings Number: 587309

DAVID L. ALBRIGHT - 9/10/2015

1            IN THE UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3    JACOB GREGOIRE,                    )

4          Plaintiff,                   )

5       vs.                             ) Case No.:

6    CALIFORNIA HIGHWAY PATROL, an      ) 14-cv-01749-GPC (DHB)

7    agency of the State of             )

8    California; SERGIO FLORES, and     )

9    DOES 1 to 20,                      )

10         Defendants.                  )

11    _____  )

12

13

14       VIDEO DEPOSITION OF DAVID L. ALBRIGHT, taken by the

15   Defendants, commencing at the hour of 1:02 p.m. on

16   Thursday, September 10, 2015, at 110 Laurel Street, San

17   Diego, California, before Kimberly A. Broadhurst,

18   Certified Shorthand Reporter in and for the State of

19   California.

20

21

22

23

24

25

DAVID L. ALBRIGHT - 9/10/2015

Page 3

```
 1     APPEARANCES:

 2     For the Plaintiff:

 3         CASEY GERRY SCHENK FRANCAVILLA BLATT & PENFIELD, LLP
           BY:  THOMAS LUNEAU, ESQ.
 4         110 Laurel Street
           San Diego, California 92101
 5         (619) 238-1811
           Tdl@cglaw.com
 6
               - and -
 7
           LAW OFFICE OF STEVE HOFFMAN
 8         BY:  STEVE HOFFMAN, ESQ.
           1320 Columbia Street, Suite 200
 9         San Diego, California 92101
           (619) 677-3015
10         Shoffmanlaw@gmail.com

11

12     For the Defendants:

13         STATE OF CALIFORNIA, DEPARTMENT OF JUSTICE
           BY:  DOUGLAS E. BAXTER, ESQ.
14         OFFICE OF THE ATTORNEY GENERAL
           600 West Broadway, Suite 1800
15         San Diego, California 92101
           (619) 645-2034
16         Douglas.Baxter@doj.ca.gov

17

18

19

20     ALSO PRESENT:

21         MR. RICARDO RAMOS, Videographer

22

23

24

25
```

DAVID L. ALBRIGHT - 9/10/2015

1       THE VIDEOGRAPHER:  Good afternoon.  The time on

2   the record is 1:02 p.m.  Today's date is September 10,

3   2015.  This begins the deposition of David Albright in

4   the matter of Jacob Gregoire versus California Highway

5   Patrol.  The case number is 14-cv-01749-GPC (DHB).

6       This deposition is taking place at 110 Laurel

7   Street in San Diego, California 92101.  The court

8   reporter is Kim Broadhurst.  I am Ricardo Ramos, the

9   videographer, retained by Hutchings Litigation Services

10  located at 400 North Tustin Avenue, Suite 301, Santa

11  Ana, California 92705.

12      This deposition is being videotaped at all

13  times unless specified to go off the video record.

14      Would all present, please, identify yourselves

15  beginning with the witness, please.

16      THE WITNESS:  Captain David Albright, Chula

17  Vista Fire Department.

18      MR. HOFFMAN:  Steve Hoffman on behalf of Jake

19  Gregoire.

20      MR. LUNEAU:  Thomas Luneau also on behalf of

21  Jake Gregoire, the paramedic/EMT.

22      MR. BAXTER:  Douglas Baxter for the State of

23  California and Officer Sergio Flores.

24      THE VIDEOGRAPHER:  Thank you.  Would the court

25  reporter, please, swear in the witness and we can

DAVID L. ALBRIGHT - 9/10/2015

Page 6

```
 1    proceed.

 2                THE REPORTER:  Would you raise your right hand?

 3                Do you state or affirm that the testimony

 4    you're about to give shall be the truth, the whole truth

 5    and nothing but the truth?

 6                THE WITNESS:  I do.

 7                (Witness sworn.)

 8                     DAVID L. ALBRIGHT,

 9    called as a witness herein, having been first duly

10    sworn, was examined and testified as follows:

11                     EXAMINATION

12    BY MR. BAXTER:

13        Q.    Good afternoon, captain Albright.

14        A.    Good afternoon.

15        Q.    Thank you for coming.

16        A.    You're welcome.

17        Q.    Just to -- if you could just, please, state

18    your full name for the record and spell your last name?

19        A.    Full name is David Lee Albright.  Last name is

20    A-l-b-r-i-g-h-t.

21        Q.    All right.  And you mentioned earlier you were

22    a captain with the Chula Vista Fire Department?

23        A.    Correct.

24        Q.    Let me just go over some preliminary things

25    about a deposition.  My name, as I said, is Doug, and
```

DAVID L. ALBRIGHT - 9/10/2015

1    problems arising out of this incident?  Has he ever

2    related that to you?

3         A.    Not that he's told me.

4         Q.    Let's finally talk about the incident.

5         A.    Okay.  That's why we're all here.

6         Q.    Going to the -- the night of the incident, I

7    just want to walk through a general synopsis of events.

8               What was your first involvement in that whole

9    incident starting with the call?  What did you receive,

10   a call?

11        A.    Yeah.  So we're sitting at the fire station, at

12   80 East J Street where we're housed, and the tones go

13   off and we get a call for a vehicle accident on the 805

14   freeway was the initial information that we got.

15        Q.    All right.  And your -- your whole crew

16   responded?

17        A.    Yeah, me, Jake and that night we had a

18   different firefighter than I currently have, but it was

19   the crew assigned to the engine that day, the three of

20   us that were at the fire station.

21        Q.    Is that standard in Chula Vista for three-man

22   crews?

23        A.    On the engines.  The trucks and rescues have

24   four, but the engines all have three.

25        Q.    Do you remember who that other firefighter was?

DAVID L. ALBRIGHT - 9/10/2015

Page 62

1      A.    Yeah.  His name is Josh Rees, R-e-e-s.

2      Q.    **Had you worked with him before?**

3      A.    I have.

4      Q.    **Okay.  At the time was he an EMT?**

5      A.    He is an EMT, yeah.  He's currently in

6  paramedics school, but at the time of the incident he

7  was an EMT.

8      Q.    **At the time you were an EMT?**

9      A.    Yeah, was and currently still am.

10     Q.    **And at the time Mr. Gregoire was an EMT?**

11     A.    Yep.

12          MR. LUNEAU:  He said engine.  And what else did

13  you say?

14          THE WITNESS:  Trucks and rescues, the ones with

15  the big ladders, and then the rescue has all the tools

16  like Jaws of Life and things, and we keep four people on

17  those just because of the manpower needed to operate the

18  equipment.

19  BY MR. BAXTER:

20     Q.    **And you ultimately responded to the scene of**

21  **this accident?**

22     A.    Yes.

23     Q.    **You initially had trouble finding it?**

24     A.    Yeah.  Initially it was not right where it was

25  reported, and I'm just going off of memory, but I

DAVID L. ALBRIGHT - 9/10/2015

Page 128

```
1    be the paramedics from the AMR 411.  I mean, they --
2    they're dressed like AMR paramedics.
3         Q.   They're not Chula Vista --
4         A.   They're not Chula Vista fire employees.
5         Q.   All right.  And then off to the left of the
6    gurney, do you see another person that appears to be in
7    a reflective vest?
8         A.   I do, yes.
9         Q.   Does that appear to be Chula Vista fire wear?
10        A.   No.  That would also be what AMR wears.  So I'm
11   assuming it's that ride-along or EMT, the third person
12   they had with them that night.
13        Q.   Right.  Can you tell -- the person that's in
14   the forefront of the picture that appears to be in a tan
15   firefighter outfit, can you tell whether that's a Chula
16   Vista or San Diego fire person?
17        A.   No, I can't.  I mean, it's just too generic.
18        Q.   All right.
19        A.   It looks like our stuff, but, I mean, yeah, I
20   can't say for sure.
21             (D. Albright Exhibit D was marked for
22             identification.)
23   BY MR. BAXTER:
24        Q.   All right.  Now I'm going to show you what I'm
25   marking as Exhibit D.  It's another photograph.  I have
```

DAVID L. ALBRIGHT - 9/10/2015

Page 129

1    a copy for counsel.

2              Do you recognize anyone in the photograph that

3    is shown in Exhibit D?

4         A.   Yes.

5         Q.   Who do you recognize in that photograph?

6         A.   That is Jake closest to us, and just because I

7    know what he look like and his big head of hair and his

8    hat, that is Captain McLintock that is back behind Jake

9    from Engine 54.

10        Q.   All right.

11        A.   That's all.  I can't tell who the other -- the

12   other people are.

13        Q.   All right.  So what I would like you to do is

14   if you can put a red X on the person you recognize to be

15   Jake just somewhere on the yellow uniform.  Does that

16   red X actually show up?

17        A.   Yes.  Yeah.  I'll do it darker, but yeah.

18        Q.   In that picture, Mr. Gregoire appears to be

19   facing the K-rail?

20        A.   Yes.

21        Q.   And on the other side, there's a CHP officer?

22        A.   Correct.

23        Q.   Is that the same CHP officer that you

24   ultimately saw handcuff Mr. Gregoire?

25        A.   Yeah.  It looks like him.

DAVID L. ALBRIGHT - 9/10/2015

1     Q.  Now, there's a person to the immediate right

2  from Jake's vantage point.

3     A.  So north of the freeway?

4     Q.  Right.

5     A.  Okay.

6     Q.  Who is that person?

7     A.  That's who looks like Captain McLintock just

8  based on knowing his profile.  That would be John

9  McLintock from Engine 54.

10     Q.  That's Chula Vista?

11     A.  Yeah.  He's the captain on Engine 54.

12     Q.  All right.  Now, in the background you see the

13  rolled over vehicle, correct?

14     A.  Yes.

15     Q.  All right.  Do you recognize any of those

16  firefighter personnel?

17     A.  Not enough to identify them, no.

18     Q.  Okay.  How many do you see?

19     A.  I see three firefighters.

20     Q.  Do you see any paramedics?

21     A.  I see one just to the right or next to the

22  vehicle in the vest and the blue pants.

23     Q.  All right.  And do you see a CHP officer in

24  that area?

25     A.  Yes, right in the middle.

DAVID L. ALBRIGHT - 9/10/2015

1    Q.   All right.  And, again, I realize you don't

2    know exactly when in the sequence of events, but does

3    this picture appear to be of events from that incident?

4    A.   Yes.

5         (D. Albright Exhibit E was marked for

6         identification.)

7    BY MR. BAXTER:

8    Q.   All right.  Now I'm going to show you a

9    photograph that I'm going to mark as Exhibit E.  Copy

10   for counsel.

11        Do you recognize anyone in that photograph?

12   A.   By name, no.

13   Q.   Okay.  Do you recognize anyone as somebody

14   that's affiliated with your agency?

15   A.   Yeah.  The -- the firefighter that appears to

16   be kneeling down near the white car, he has that

17   orangish shield on his helmet.  That designates a

18   probationary firefighter.  So I recognize that, that

19   that was one of our -- we had a whole group of new

20   people that came on, and that's one of those guys.

21   Q.   Okay.  Was it -- was Mr. Rees probationary?

22   A.   No, no.  That is not -- that is not Josh Rees.

23   Q.   So that person would not be from your engine?

24   A.   He would not be.

25   Q.   All right.  And do you see two people in

DAVID L. ALBRIGHT - 9/10/2015

1    that -- it's in the same sequence as that same

2    firefighter walking, but you don't recognize -- you

3    can't tell from the uniform?

4        A.    No.  I can't tell who he is.

5        Q.    Could it be Mr. Rees or do you --

6        A.    Yeah, it could be.  I mean, he has a black

7    helmet and yellow turnouts.  I just can't tell you that

8    it is.

9        Q.    All right.  With respect to the vehicle that

10   was overturned, at any point during the incident did you

11   ever have any concerns that there was a fire risk with

12   that vehicle?

13       A.    Well, in the sense that there's always a fire

14   risk with any vehicle accident, we always are taught to

15   check for leaking fluids; and if there's a gas leak, we

16   actually try to plug it.  We carry plugs on the rigs

17   because the tow truck won't tow it while it's leaking

18   fuel.

19              So on every incident, yes.  So somebody did

20   check that.  Typically that's the engineer's job.  So I

21   don't know if Jake ever made it over to check the

22   vehicle.  That would have been one of the things he

23   would have done, but that would have gotten checked by

24   one of the engineers on the scene.  That's typically

25   what they do.  They worry about stabilizing the vehicle,

DAVID L. ALBRIGHT - 9/10/2015

1   checking for fuel leaks, disconnecting the battery for

2   fire hazard reasons.

3       Q.   All right.  Would that have been the same

4   responsibility as the engineer from 54?

5       A.   Yeah.  Typically, that's what engineers do, but

6   depending on what 54 was doing, they may or may not.

7   Their engineer may be with them doing patient care.

8            So in the sense that typically the engineer

9   from the apparatus is the one that does that, it could

10  be any engineer at the scene that would do it.  I just

11  don't know who did it that night.

12      Q.   You didn't personally witness that?

13      A.   No.

14      Q.   Did you yourself ever personally become aware

15  of any leaking gas from that vehicle?

16      A.   No.  I never got close enough to actually see

17  or smell a gas leak.  I don't know if there was one.

18      Q.   Did you see any smoke coming from the vehicle?

19      A.   Not that I recall, no.

20      Q.   Any sparking?

21      A.   No.  It was already at rest, so there was no

22  sparking.

23      Q.   The vehicle was completely stationary?

24      A.   Yeah.  It wasn't moving.

25      Q.   Were you aware of whether there was any belief

DAVID L. ALBRIGHT - 9/10/2015

1    that there might be other patients in the immediate

2    vicinity besides those two?

3         A.   I do recall there being a concern that there

4    could have been a patient either a third patient or

5    somebody that was in the vehicle that may have been

6    tossed or ejected.  I just heard that come up, and I

7    don't know what led people to believe it, whether they

8    saw three seat belts seat belted.

9              I don't know.  I just remember that being

10   talked about for a brief period, and then it was

11   disregarded as not true or that we didn't have a third

12   patient.  We just had the two that we treated.

13        Q.   Do you know if -- if there was a perception of

14   a fire risk, would the practice be to bring some sort of

15   fire suppression equipment near the vehicle?

16        A.   Yeah.  I mean, yeah.  If you thought there was

17   a fire, you could bring an extinguisher or deploy a hose

18   line.  Sometimes it happens.  Sometimes it doesn't, but

19   that is an option available to us, yes.

20        Q.   Did you ever witness anybody bringing a fire

21   extinguisher near the vehicle?

22        A.   I did not see that.

23        Q.   Did you see anybody even pumping up the truck

24   to deploy a hose line?

25        A.   No, I did not.

DAVID L. ALBRIGHT - 9/10/2015

1  **Q.   Do you agree based on your training and**
2  **experience that lane blockages by fire trucks sometimes**
3  **lead to secondarily accidents in traffic?**
4  A.   Yes.  I have -- I've seen them.  They do occur,
5  whether it's fire trucks, ambulances or CHP vehicles.
6  Any time you stop traffic or operate on the freeway,
7  there's a good likelihood that there's going to be
8  either skid marks or a second accident in the area.
9  **Q.   You agree that that's a recognized risk?**
10  A.   I've seen it happen, yes.  It would be a risk.
11  **Q.   And your statement was that you would rather**
12  **have that risk even if it meant someone running into**
13  **your truck and getting killed as opposed to something**
14  **happening to your patients that you're responsible for?**
15  A.   Yes.  So it's hypothetical.  I would rather
16  block the scene and have someone injured or killed
17  hitting our fire engine than having to wipe out the
18  three or four guys that I'm responsible for and all the
19  patients.  So absolutely.  And it's happened before.  It
20  happened in San Diego on I-8 recently where a fire truck
21  was clobbered and the patient was pinned to the vehicle
22  but no firefighters were injured, and it totaled --
23  totaled the engine.  And that's why we're taught to do
24  what we do in my opinion.
25  **Q.   All right.  After you and Mr. Gregoire and**

DAVID L. ALBRIGHT - 9/10/2015

Page 177

1    BY MR. BAXTER:

2         Q.   **Do you recognize anyone in that picture?**

3         A.   Yes.  That would be me sitting on the -- the

4    median, and that was my Battalion Chief Darrell who

5    arrived to assist us, as I've talked about.  I believe

6    that's us exchanging information.  I don't remember at

7    what point that was.

8         Q.   **All right.  But that was from the night of the**

9    **incident?**

10        A.   That was, yes, the night of the incident after

11   Darrell arrived, whatever point that was.

12             MR. BAXTER:  All right.  Do you have questions?

13             MR. HOFFMAN:  I do.

14                        EXAMINATION

15   BY MR. HOFFMAN:

16        Q.   **Tell me about how many total years have you**

17   **been a firefighter or engaged in or with the fire**

18   **department.**

19        A.   I've been employed by the City of Chula Vista

20   since 1995, so 20 -- 20 years, and I was a reserve

21   firefighter at San Miguel Fire Department for nine

22   months and a fire explorer for Chula Vista for two years

23   prior to that where I was running calls and learning as

24   a student.

25        Q.   Okay.  So employed for 20, running calls and

```
 1                    C E R T I F I C A T E

 2

 3     I, KIMBERLY A. BROADHURST, Certified Shorthand Reporter

 4     for the State of California, do hereby certify:

 5

 6     That the witness in the foregoing deposition was by me

 7     first duly sworn to testify to the truth, the whole

 8     truth and nothing but the truth in the foregoing cause;

 9     that the deposition was taken by me stenographically and

10     later transcribed into typewriting, under my direction,

11     and that the foregoing contains a true record of the

12     testimony of the witness.

13

14     Dated this   day of September, 2015, at San Diego,

15     California.

16

17

18

19

20     _____

21            KIMBERLY A. BROADHURST

22            C.S.R. NO. 13814

23

24

25
```

# David L. Albright

## Gregoire vs. California Highway Patrol



**Job: 265788**

**Exhibit: 0000D**







