| | |
|---|---|
| 1 | KAMALA D. HARRIS |
| | Attorney General of California |
| 2 | RICHARD F. WOLFE |
| | Supervising Deputy Attorney General |
| 3 | DOUGLAS E. BAXTER |
| | Deputy Attorney General |
| 4 | State Bar No. 201351 |
| |   600 West Broadway, Suite 1800 |
| 5 |   San Diego, CA 92101 |
| |   P.O. Box 85266 |
| 6 |   San Diego, CA 92186-5266 |
| |   Telephone:  (619) 645-2034 |
| 7 |   Fax:          (619) 645-2012 |
| |   E-mail:  Douglas.Baxter@doj.ca.gov |
| 8 | *Attorneys for Defendant State of California* |
| | *(by and through the California Highway* |
| 9 | *Patrol) and Sergio Flores* |

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JACOB GREGOIRE,<br><br>                      Plaintiff,<br><br>v.<br><br>CALIFORNIA HIGHWAY PATROL, an agency of the State of California; SERGIO FLORES, and DOES 1 to 20,<br><br>                      Defendants. | Case No.: 14-cv-01749-GPC (DHB)<br><br>**DECLARATION OF ELIAZAR COLUNGA IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, FOR SUMMARY ADJUDICATION OF CLAIMS**<br><br>Date:        January 29, 2016<br>Time:       1:30 p.m.<br>Courtroom: 2D<br>Judge:      The Honorable Gonzalo P. Curiel |

I, Eliazar Colunga, hereby declare as follows:

1. I am employed as a patrol officer for Defendant California Highway Patrol (CHP). I have been so employed for approximately 17 years.

2. On February 4, 2014, I was working the C-watch, which runs from 5:00 p.m. to 5:30 a.m. During the events related below, I was wearing a tan CHP uniform that bore CHP patches identifying me as a law enforcement officer.

1

3. Just before 9:30 p.m., I heard a radio call regarding an overturned vehicle in the area of I-805 and Telegraph Canyon Road. I responded from the area of the E Street Nature Center in the City of Chula Vista in my patrol vehicle. I was the first on-duty emergency responder from any agency to arrive on scene. The collision had occurred in the northbound lanes, and the vehicle to which I was responding came to rest in a wide construction area between cement k-rail walls that separated the northbound and southbound lanes. I parked my vehicle south of the collision, where the k-rails on the southbound side ended and the center construction area was accessible. I parked in the center construction area, out of traffic lanes.

4. Based on my training and experience, it was my belief that, as the law enforcement officer on scene, I was the Incident Commander.

5. Upon approaching the overturned vehicle, I made contact with two civilians (one of whom was an off-duty Emergency Medical Technician [EMT]). They had come upon the accident scene before me, but they had not been involved in the collision. Both of the occupants of the overturned vehicle were already out of the vehicle. Neither required any extraction equipment or on-duty emergency personnel to get them out of the vehicle. They were both conscious. I was able to communicate with them during that evening. At the point I walked up, one was lying on the ground. The other was standing. Although I did not personally see any visible injuries on these two occupants, I went back to my patrol vehicle to obtain a first aid bag. I saw that the off-duty EMT was holding the head of the person who was lying on the ground in C-spine position, and I could see that the off-duty EMT did not have any equipment. Because we have C-spine collars in our first aid bags, I went to get my bag.

6. As I was approaching my patrol vehicle, an ambulance from American Medical Response (AMR) arrived. This ambulance arrived within a couple of minutes of my arrival. The ambulance parked in the center construction area just

south of my car, and out of traffic lanes.

7. Once I saw the paramedic personnel from the AMR crew walking toward the rollover vehicle with their gear, I determined that it was not necessary to retrieve a first aid bag. There were three people from the AMR ambulance, and I believed at the time that they were all paramedics. (Well after the events of this evening, I later learned that two of them were paramedics and one was an EMT.) Based on the presence of the ambulance crew, I concluded that sufficient medical care was now on scene for the two occupants of the rollover vehicle. I moved on to engage in other scene management and investigation activities.

8. Based on my training and experience as a CHP Officer, I know that a CHP Officer's responsibilities as an Incident Commander at a traffic scene include assessing the entire scene, making sure that medical care has been summoned for any potentially injured parties, making sure that the people on scene (civilians and first responders) are safe and not in the way of traffic or in any type of hazard. CHP Officers are responsible for managing the entire scene, which includes controlling where equipment and personnel are located so as to minimize safety hazards to those on scene and to the motoring public nearby or approaching the scene.

9. Soon after the ambulance arrived, fire trucks began arriving. One of those fire trucks was Engine 52 from the Chula Vista Fire Department. This truck parked in the number 1 lane on the southbound side. Two other fire trucks arrived within short succession and parked behind Engine 52, blocking the number 1 and 2 lanes (the lanes closest to the center of the southbound roadway). A fourth fire truck also came to the scene.

10. Knowing that the patients were being attended to by paramedics and that there was no collision scene in traffic lanes, I became concerned about the presence of fire trucks blocking lanes. I believed that there was sufficient medical personnel to tend to patients, that too many fire crews were on scene, and that the trucks

should be moved out of lanes. I talked to crew members of two trucks and explained that they were not needed and should leave the scene and return to their stations. These two trucks left the scene within a few minutes. I subsequently had conversations with members of the other two fire crews to ask them to move their trucks into the center median. I was concerned about unnecessary placement of fire trucks in traffic lanes, as we are taught at CHP, and I know from my own personal experience with responding to other traffic accidents, that secondary accidents at collision scenes are a serious risk to the motoring public. Placement of emergency equipment at collision scenes creates a serious risk of causing secondary accidents among other motorists approaching the scene. An important part of our duties as incident managers at CHP is to take appropriate steps to eliminate possible causes of secondary accidents.

11. At this particular scene, there were four southbound lanes in the immediate area. North of the scene, there were no shoulders in the southbound lanes because of the cement k-rail running adjacent to the inner edge of lane number 1. The trucks were blocking the number 1 lane and approximately one-half of the number 2 lane for southbound traffic. This was causing a hazard for southbound traffic. Just north of the collision scene, there is a crest in the roadway. As a result, southbound traffic did not have a direct line of sight allowing them to see the fire trucks from a long distance. There was a short distance between the point where cars would come over the crest and the point where the fire trucks were stopped. This did not allow a lot of reaction time for southbound vehicles that could be approaching the scene at high speeds. On a freeway such as the I-805, vehicles typically travel at high rates of speed. Particularly at the beginning of my time at this scene, I could hear people locking their brakes as they approached the scene. All of these facts led me to conclude that there was a significant risk of secondary accidents from the placement of fire trucks in the lanes. I also knew that the entire collision scene was enclosed in the construction areas, with cement k-rails

4

DECLARATION OF ELIAZAR COLUNGA IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION (14-cv-01749-GPC (DHB))

1 blocking off the scene from southbound and northbound traffic. There was no
2 debris from the collision in the southbound lanes, as no part of the collision
3 occurred there. I saw no reason for the trucks to be parked in the lanes, and I
4 wanted them moved out of lanes. Based on my training and experience and
5 assessment of the scene, I concluded the trucks were posing a serious risk to the
6 motoring public without apparent reason. I formed this opinion at the scene, and
7 this was the reason I was asking the fire trucks to move out of lanes.

8   12. The crews in these latter two trucks were from the Chula Vista Fire
9 Department. Despite my requests to move the fire trucks, they did not move. I
10 went back to the overturned vehicle to try to gather some information from one of
11 the victims. I subsequently noticed that the two trucks were still parked in lanes. I
12 went back and spoke to the crews again to request that they move the fire trucks.
13 During this last discussion, I saw Officer Flores walking up to where I was standing
14 with the fire fighters. He got sufficiently close to me that, in my opinion, he could
15 have overheard this conversation.

16   13. I wanted the fire crews to move the fire trucks when I asked them to do
17 so. I expected them to comply with my requests. They did not.

18   14. Since this collision scene was on Officer Flores' beat, I knew that he took
19 over my role as Incident Commander once he arrived. He took over the scene
20 management at that point. This has been the standard practice amongst officers
21 with whom I have worked in the nearly seventeen years I have been with the CHP.
22 It has been the practice between Officer Flores and me for more than 10 years.

23   15. At no time during my time at the accident scene did I see Engineer
24 Gregoire engaged in activities that appeared to me to constitute patient care. Prior
25 to his arrest, I did see him standing with a group of fire fighters in the center
26 median area, but he did not appear to me to be assisting in patient care.

27   16. At no time on the scene did I see a fire. I saw no smoke. I did not smell
28 any smoke. I did not see or smell any gas leaking from the overturned vehicle. The

| | |
|---|---|
| 1 | overturned vehicle was not moving when I arrived. I never saw any sparking near |
| 2 | the overturned vehicle. I did not see anything that indicated to me there was a |
| 3 | likelihood of a fire occurring at that scene. |
| 4 |     17. In my experience of having responded to numerous traffic collisions |
| 5 | during my time at CHP, it is common for ambulances departing the scene of traffic |
| 6 | collisions to safely merge into freeway traffic without the need for a lane blockage |
| 7 | from a fire truck. At this scene, I did not form a belief that it would be necessary |
| 8 | for the fire trucks to remain blocking lanes in order to protect the pathway of the |
| 9 | ambulance when it came time for it to leave the scene. |
| 10 |     I, Eliazar Colunga, affirm under penalty of perjury under the laws of the State |
| 11 | of California and of the United States that the foregoing information is true and |
| 12 | correct of my own knowledge and that this declaration is being executed on this |
| 13 | 19TH day of November 2015 at San Diego, California. |

                                                                          *[signature]*

                                                                          Eliazar Colunga