Daniel M. Gilleon, SBN 195200
Steve Hoffman, SBN 237466
**THE GILLEON LAW FIRM**
1320 Columbia Street, Suite 200
San Diego, CA 92101
Telephone:  (619) 702-8623
Facsimile:   (619) 702-6337

David S. Casey, Jr., SBN 060768
Thomas D. Luneau, SBN 145804
**CASEY GERRY SCHENK
FRANCAVILLA BLATT & PENFIELD, LLP**
110 Laurel Street
San Diego, CA  92101
Telephone: (619) 238-1811
Facsimile: (619) 544-9232

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JACOB GREGOIRE, | CASE NO. 14-cv-1749-GPC (DHB) |
| Plaintiff, | Judge: Hon. Gonzalo P. Curiel<br>Dept:  2D |
| v. | **DECLARATION OF THOMAS D. LUNEAU RE: PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT FILED BY DEFENDANTS CALIFORNIA HIGHWAY PATROL** |
| CALIFORNIA HIGHWAY PATROL, an agency of the State of California; SERGIO FLORES, and DOES 1 to 20, | |
| Defendants. | Date:  February 19, 2016<br>Time: 1:30 p.m. |

I, THOMAS D. LUNEAU, declare as follows:

1.      I am an attorney duly licensed to practice before all of the courts of the State of California and am attorney in the law firm of Casey Gerry Schenk Francavilla Blatt & Penfield LLP, attorneys of record for plaintiffs herein.

2.      All matters stated herein are personally known to me, and if called as a

DECLARATION OF  THOMAS D. LUNEAU RE; OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT

witness in this matter, I could competently testify thereto.

3.     This declaration is being submitted in support of Plaintiffs' Opposition to the Motion for Summary Judgment filed by Defendants California Highway Patrol and Sergio Flores in this case.

4.     Attached to this Declaration as Exhibit 1 is a true and correct copy of excerpts from the deposition of Captain David Albright.

5.     Attached to this Declaration as Exhibit 2 is a true and correct copy of excerpts from the deposition of Jacob Gregoire.

6.     Attached to this Declaration as Exhibit 3 is a true and correct copy of excerpts of the deposition of Sergio Flores.

7.     Attached to this Declaration as Exhibit 4 is a true and correct copy of Exhibit 2 to plaintiff Gregorie's deposition.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 19th day of January, 2016, at San Diego, California.

Respectfully submitted,

CASEY GERRY SCHENK
FRANCAVILLA BLATT & PENFIELD


 s/Thomas D. Luneau
THOMAS D. LUNEAU
*tdl@cglaw.com*
*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA


JACOB GREGOIRE,                    )

      Plaintiff,               )

   vs.                             ) Case No.:

CALIFORNIA HIGHWAY PATROL, an      ) 14-cv-01749-GPC (DHB)

agency of the State of             )

California; SERGIO FLORES, and     )

DOES 1 to 20,                      )

      Defendants.              )

_____ )



VIDEO DEPOSITION OF DAVID L. ALBRIGHT

San Diego, California

September 10, 2015



REPORTED BY:  KIMBERLY A. BROADHURST, CSR NO. 13814

Hutchings Number: 587309

Exhibit 1

DAVID L. ALBRIGHT – 9/10/2015

1  A.   Correct.

2  Q.   When you first arrived on scene, were there any

3  other first responders present of any agency to your

4  knowledge?

5  A.   Yes.   There was an AMR ambulance.   I believe it

6  was 411.   It was spotted ahead of us.

7  Q.   When you use the word "spotted," does that have

8  significance in your --

9  A.   Yeah.   I'm sorry.   Spotting in terms of the

10  fire service is where you position your apparatus when

11  you get out.   So you're leaving it in that position that

12  it's spotted in the traffic lane or wherever you put it.

13  Q.   When you arrived on scene, where was that AMR

14  vehicle spotted?

15  A.   The AMR ambulance was about 50 percent into the

16  dirt shoulder and about 50 percent into the No. 1 or

17  fast lane.   There was construction in the area, so it's

18  kind of hard to picture, but they were on a diagonal,

19  kind of right where the construction was ending sticking

20  front of their ambulance towards the center divide in

21  the dirt and the rear where the gurney came out was

22  facing the No. 1 fast lane.

23  Q.   So the rear of the ambulance was in the No. 1

24  lane?

25  A.   It was protruding into it, yeah, two or three

DAVID L. ALBRIGHT - 9/10/2015

1    feet, the corner of it.  They couldn't get all the way

2    off of -- out of that traffic lane.

3        Q.   All right.  Other than that AMR ambulance, did

4    you notice whether there were any other first responder

5    agencies on scene before you arrived?

6        A.   I did not see anybody.

7        Q.   Have you since learned whether there were any

8    other agencies present besides AMR before you arrived?

9        A.   No.  I don't have any knowledge of that.

10       Q.   You never heard about a CHP being there before

11   you?

12       A.   No.

13       Q.   And when you arrived, did you call out anything

14   on the radio?

15       A.   Well, we always give what's called a size-up.

16   It's basically an on-scene report of what you find.

17            Any time we're responding with another fire

18   engine or not by ourselves, you give an on-scene report

19   to advise of what you find.  So, yes, I did make a radio

20   report to our communication center.

21       Q.   Do you recall what your -- what your report

22   said?

23       A.   Well, the first -- the very first traffic I

24   believe I said was that we were having trouble finding

25   it and I asked for a call back and then at that point

DAVID L. ALBRIGHT - 9/10/2015

1    Jake said, I think I see it in the center divide.

2            And so once we located it and we found it, then

3    I gave an on-scene report of I believe it was an

4    overturned vehicle into the construction site in the

5    middle of the freeway, unknown injuries, but I think

6    there was -- there was two patients laying or sitting

7    outside of the vehicle next to where it had flipped

8    over.

9            And so I gave that report, said Unknown patient

10   count.  Establishing 805 IC, and I think investigating

11   because that's typically what we do, we go investigate

12   to see what's going on.

13        Q.   Now, when you made these reports, were you

14   still in your vehicle or were you using some sort of

15   body radio?

16        A.   The initial part that I just described would

17   have been from in the vehicle.  And then once we spot

18   and get out, then I'm on a mobile radio as the IC

19   walking around.  So there's a transition where I'm

20   getting out of the fire engine, all of us are, and going

21   to work.

22        Q.   But the initial part that you just summarized

23   for me, that was all made while you were still in the

24   vehicle?

25        A.   Yes, from the front seat where I -- where I

DAVID L. ALBRIGHT - 9/10/2015

1    to the CHP.

2        Q.    That's your belief?

3        A.    That's my belief.

4        Q.    Based on your training and experience?

5        A.    Unless they come up on one of our channels.  We

6    don't have CHP channels.  I know for a fact we don't

7    have CHP channels in our radio.  There may be a mutual

8    channel that we can talk to each other on, but I've

9    never been shown what that channel is.

10       Q.    And when you arrived on the scene and made your

11   call out that you were IC 805 --

12       A.    Right.

13       Q.    -- do you have an opinion as to whether or not

14   you were on a channel that CHP could have heard that?

15       A.    I doubt that I would be.

16       Q.    Okay.  And once you -- you're still in the

17   seat -- when you're still in the seat, the front right

18   seat, is that when you made the call out, I'm 80 -- I'm

19   IC?

20       A.    Yes, before I exit the vehicle.  It's part of

21   the size up.  Size up, spot the vehicle and then we exit

22   to go -- to go work.

23       Q.    All right.  Can you describe for me the

24   sequence in which the three of you exited the vehicle?

25       A.    After the vehicle was spotted into the position

DAVID L. ALBRIGHT - 9/10/2015

1    we described, I got out, and the firefighter that sits

2    right behind me.  So our doors are on the same side of

3    the apparatus.  We both got out and started walking it

4    would be northbound toward the back of our engine up to

5    where the vehicle was.

6            I can't speak to when Jake got out.  I did see

7    him out of the vehicle shortly after, but I didn't

8    physically watch him open the door and get out.

9            Typically he's doing those things we just

10   discussed, inverter, brakes, lights, and it takes the

11   engineer normally a little bit longer to get out than it

12   would the other crew.

13   Q.    Did you make any assessments at the time of

14   doing your size-up as to whether or not the Engine 52

15   could have parked anywhere in the center divider area?

16   A.    The only place in the center divide we could

17   have parked, and it was not part of my thought process,

18   but thinking about it now, we could have parked in front

19   of the AMR ambulance 2- or 300 feet or yards ahead of

20   them and gotten -- because the construction came to an

21   end at that point.

22           But I'm the one that made the call to put it

23   behind the ambulance as per these classes that we have

24   about Traffic Incident Management and blocking and

25   protecting the scene.

DAVID L. ALBRIGHT - 9/10/2015

```
 1            So, yes, it could have been placed further up,
 2    but I'm the one that told Jake to put it where we did,
 3    and that's typically how it works.  It ultimately is
 4    the -- he's driving, but it's the captain's call on how
 5    many lanes we're going to take out, typically, where do
 6    you want me to put it and what do you want me to do.
 7        Q.   All right.  Do you recall where in relation
 8    to -- can you describe for me the layout of the scene
 9    where the car was found?
10        A.   So southbound 805, northbound 805, and there's
11    K-rails where the median normally is because they're
12    putting in a carpool lane so --
13            MR. LUNEAU:  Videographer, are you getting
14    this?
15            THE WITNESS:  Both fast lanes have K-rail, and
16    then the car had flipped coming northbound into that
17    middle area between those two K-rail.  So it was
18    technically in the area between the two freeway lanes,
19    if that makes sense.  And it was resting on its roof
20    upside down between the two K-rails inside.
21    BY MR. BAXTER:
22        Q.   All right.  And the K-rails on both sides with
23    respect to the southbound side, did the K-rail directly
24    abut the No. 1 lane?
25        A.   Yes.  So where the center divide or the dirt
```

DAVID L. ALBRIGHT - 9/10/2015

Page 84

1    shoulder normally is, the K-rail was up against -- I

2    even remember, I believe, that it was hard to get

3    equipment out at one point because we were very close to

4    that K-rail, so there was just K-rail and then fast lane

5    where our engine was.

6        Q.   So no shoulder on the southbound side between

7    the inner edge of the No. 1 lane and the K-rail?

8        A.   Correct, until about -- until you passed the

9    ambulance.  Right where we were stopped there was not.

10       Q.   Okay.  The same description for the northbound

11   side?

12       A.   I don't know because I didn't go over.  I know

13   for a fact where the car was there was K-rail, but I

14   didn't look back to see if it stopped at the same side

15   where ours did.  I don't know.

16       Q.   Now, do you have any recollection as to whether

17   or not there was an additional older cement K-rail

18   center divider in between those two K-rails?

19       A.   I don't.  I know there was one, but I don't

20   remember if I saw one that night.

21       Q.   Okay.

22       A.   Because the construction.  I just don't have a

23   recollection of that.

24       Q.   Looking back now, do you now recall that there

25   was an older center divider in between those two

GREGOIRE - 9/16/2015

Page 66

1      station."

2          Q      Had he already asked -- yelled out, "Who's

3      driving this engine?"

4          A      Yes.

5          Q      All right.  Did you answer if that was you?

6          A      Yes.

7          Q      All right.  How did you -- what did you

8      specifically say?

9          A      "I am."

10         Q      All right.  And at this point where were you

11     standing in relation to the patients?

12         A      I'm standing next to the gurney holding the

13     flashlight over the gurney and the patients.

14         Q      All right.  Then how many times did he tell

15     you to move the engine?

16         A      I don't recall the exact number.  He never

17     asked me to move it.  He told me to get in it and go

18     back to the fire station.

19         Q      All right.  And you understood that to mean

20     drive away from the scene?

21         A      To leave.

22         Q      All right.  Did he tell you any reason why?

23         A      Nope.

24         Q      What, if anything, did you say back to him?

25         A      I said, "We're out here" -- I have to review

Exhibit 2

GREGOIRE - 9/16/2015

1    my notes again, but something to the effect of, "We're

2    out here trying to help people.  Why are you doing

3    this?"

4         Q    Anything else?

5         A    He said, "If you don't -- if you don't leave

6    now, I'm going to arrest you."

7              And I said, "Well, I can't move the fire

8    engine, so you'll have to arrest me."

9         Q    Did you attempt to consult with

10   Captain Albright at all before you told the officer that

11   you cannot move the engine?

12        A    I did not because he was walking back to the

13   engine getting a cell phone.  I had no opportunity to.

14        Q    All right.  Did you make any other statements

15   to that officer before he told you to come over to be

16   arrested?

17        A    Not that I recall, no.

18        Q    Okay.  And then what did he say next?

19        A    He said, "You're under arrest.  Climb over the

20   wall."

21        Q    All right.  And that's what you did?

22        A    I did.

23        Q    All right.  And then that's where we see you

24   on the news yelling to somebody?

25        A    To my captain --

GREGOIRE — 9/16/2015

Page 72

```
 1        A    I asked him if we could please move to the
 2   other side of the vehicle and that I would tell him
 3   everything I had in my pockets and that I was
 4   cooperating, and he obliged.
 5        Q    All right.  So the two of you moved to the --
 6        A    To the front of the vehicle, I believe.
 7        Q    All right.  And did he continue searching you
 8   at that point?
 9        A    Yes.
10        Q    All right.  How long did that process of
11   searching you last?
12        A    I don't recall.  Maybe a minute or so.
13        Q    All right.  And at this point had you made any
14   complaints about the handcuffs?
15        A    At this point, no.
16        Q    All right.  What happened next?
17        A    Well, when we were to the side of the vehicle,
18   I asked him if he could loosen the handcuffs.
19        Q    When -- after he was done searching you?
20        A    Yes, before he was putting me in the car.
21        Q    All right.  And what, if anything, did he say
22   in response?
23        A    He tightened them.
24        Q    How did he do that?
25        A    I'm not familiar with how handcuffs work, but
```

Volume II                    **Confidential - Pursuant to Protective Order**
Sergio Flores                                  Gregoire vs. California Highway Patrol

1                  UNITED STATES DISTRICT COURT

2                SOUTHERN DISTRICT OF CALIFORNIA

3

4

JACOB GREGOIRE,

5

6              Plaintiff,
                                        Case No.:
7              vs.                  14-cv-1749-GPC(DHB)

8    CALIFORNIA HIGHWAY PATROL, an
     agency of the State of
9    California; SERGIO FLORES, and
     DOES 1 to 20,

10
               Defendants.
11

12   _____

13

14       VIDEOTAPED DEPOSITION OF SERGIO FLORES

15              SAN DIEGO, CALIFORNIA

16           TUESDAY, NOVEMBER 10, 2015

17      VOLUME II, PAGES 93 through 189, INCLUSIVE,

18

19

20

21

22

23   Reported By:
     Linda E. Marquette
24   RPR, CLR, CSR No. 11874

25   Job No.: 10020170

Exhibit 3

1    upon your arrival?

2       A.    Well, not just in my mind.  In fact I did

3    become incident commander.

4       Q.    Right.  Okay.  So you were interviewed shortly

5    after this by -- by who from the CHP, if you know?

6       A.    I believe it was Sergeant Eglin and I believe

7    Lieutenant Ruano.

8       Q.    Okay.  And I'm going to show you what I'm

9    going to mark as Exhibit 12 and ask you if you've ever

10   seen this summary of three interviews that you were

11   involved in with the CHP regarding this incident.

12             (Exhibit 12 marked for identification

13             by the certified shorthand reporter.)

14      A.    It looks like the -- the one that I reviewed

15   some time ago, yes.

16   BY MR. LUNEAU:

17      Q.    All right.  And I'm looking at -- on page 18

18   of Exhibit 12, which is the second page.  It says in the

19   last sentence of the first paragraph, and I think this

20   is quoting you -- let me back up.

21             When you got to the scene, did you see

22   firefighters helping the paramedics with the two

23   victims, the two injured people?

24      A.    I remember seeing emergency personnel.  It may

25   have been firefighters and/or paramedics.

1    A.     I don't know.

2         Q.     How many people were treated at the scene by

3    paramedics and fire -- firefighters, if you know?

4         A.     I remember one specifically being treated.  I

5    don't recall the other.  I believe -- I don't remember

6    the other, second one.

7         Q.     All right.  And that one person, do you recall

8    that -- that person on a gurney?

9         A.     I don't recall.  I believe he was lying down.

10   I don't remember if it was on a gurney or backboard or

11   what.

12        Q.     And on the night of this incident, you gave no

13   medical treatment at all to any of the injured parties,

14   true?

15        A.     True.

16        Q.     And likewise, you were not aware of any CHP

17   officers giving any medical assistance to any of the

18   victims or injured parties on the night of this incident

19   at the scene?

20        A.     I am -- I am not aware of any CHP that may

21   have contacted or provided medical treatment.

22        Q.     All right.  And then on the second paragraph

23   here it says:

24                    "He said, in the area to the west

25                of the vehicle, but still within the

1      A.    I don't believe it's an infraction.

2      Q.    For that violation.  Let me take it back.  I'm

3  going to reword it.

4            Have you ever given individuals tickets for

5  violation of 148 Penal Code?

6      A.    Again, I don't recall having ever done that.

7      Q.    You have the option of giving someone a

8  written ticket for a violation of -- what you perceive

9  to be a violation of 148, true?

10     A.    I don't -- I don't know specifically if we do.

11  Our practice is to take someone in custody.  And if --

12  if it's determined that just a citation should be

13  issued, then we'll do what's called 849B to release from

14  custody and perhaps issue a citation.

15     Q.    Did you perceive firefighter Gregoire to be

16  some sort of a threat to you at the scene when he

17  refused to move the fire truck?

18     A.    No.  That didn't enter my mind.

19     Q.    Did he in any way -- let me withdraw that.

20           When you told firefighter Gregoire that you

21  were going to arrest him if he didn't move the fire

22  truck, in your mind, do you believe you were threatening

23  him?

24     A.    No.

25     Q.    What was your intent for making that -- that

1    comment?

2        A.    For him to understand the severity of the

3    situation that he was causing and explained to him what

4    the consequences would be for failing to obey the order.

5        Q.    Were you upset with the fire captain for not

6    obeying Officer Colunga's order to move the fire truck?

7        A.    No, not upset.  It was -- it was frustrating.

8        Q.    Did that sort of raise your blood pressure

9    after hearing the captain disobeying the directive by

10   Officer Colunga?

11       A.    No, I don't believe my blood pressure was

12   affected by that.

13       Q.    You're aware of Sergeant Pacheco -- Pacheco?

14       A.    I know who she is.

15       Q.    You're aware that she came to the scene,

16   correct?

17       A.    Yes.

18       Q.    She seemed -- strike that.

19             She told us that when she got to the scene,

20   you seemed like you were agitated or upset.  Were you

21   later upset or agitated at some point?

22       A.    No, no.

23       Q.    So if she in fact said that, she

24   misinterpreted your emotions?

25       A.    I would say so, yes.

arrest you." I replied with "I am sorry but I cannot do that." He replied with "then I am going to arrest you." I replied with "well, I guess you're just going to have to arrest me because I cannot move the engine right now." He then became quite angry, yelling at me to climb over the wall and come to him. I said ok, and asked if I could please at least let my supervisor (Captain Albright) know what was happening as he was about 30 feet away from me walking back to the fire engine. He angrily said "no, you are under arrest." At this point I yelled to my Captain that I am being arrested because I will not move the fire engine. (This is where it appears as though I was telling the media, however I was not). My Captain replied with "OK, I will let the Battalion Chief know. He then grabbed my hands putting them behind my back and at the same time I asked over my shoulder if I could at least notify my Captain of where you are taking me, and again I got the exact same reply "no, you are under arrest."

After he handcuffed me, he began walking me down the construction zone roughly 80-100 yards or so north of the incident to his car. I then asked him, "hey can we just stop and talk about this and work this out?" He replied with "no, you are under arrest." When we got to the front of his car, he walked me to the passenger side and began searching my turnout pockets while standing right in the middle of the #2 lane. I politely asked, "sir, this whole thing to me is about safety, could you please search my pockets and I'll tell you what I have on me, over on the other side of your vehicle"? He said "fine", and kind of maneuvered me over to the other side where he began emptying my pockets onto the hood of his vehicle. I told him that all I had on me is a pocket knife, a small flashlight, and a strap of webbing. He pulled all of those out of my pockets and placed them on the hood of his vehicle. He then wanted to know what I had in my large BA pocket on my chest. I told him that it was my Breathing mask for going into fires, and he said "well I want to see it anyway". At this point he removed my helmet and took my personal radio as well.

I asked him if he would not mind loosening the handcuffs a little as they were extremely tight and that I was not going anywhere and that I am cooperating. He then locked them, which made them tighten down even more. He walked me to the rear passenger door and moved the front passenger seat forward so that I could be put in the car. I asked one last time if he could please loosen the cuffs just a little as they were making my wrists and now shoulders really hurt, and he just closed the door without a reply. He then got into the driver's seat and asked me my name. I spelled it for him, and noticed that he misspelled my last name so I politely said that I think you misspelled it in your computer where he was logging my information. He then asked me my phone number and to confirm my home address. I asked him politely what exactly I was being arrested for and he told me "148" I then said that I did not know what that was and could he explain. He then got a bit confused, said the word "obeying." He then said, "I don't know I will have to ask my supervisor."

At this point I sat rather uncomfortably in the back of the car in amazement of how rude and rough he was with me. I felt like I was being treated as a criminal, which I guess he felt I was. After what seemed like a half hour, he opened my door and said "this is not over yet, you are not being arrested but I am not done with you! You are going to have to answer for your actions." I did not say a word as I felt as though I was being threatened and I was just happy to be getting out of the handcuffs. He said you are free to go but hold on I have some paperwork for you to sign. At this point I politely asked if my crew were in possession of the items he removed from my person, and he told me no that his partner has them for me. His partner (the shorter one) then stepped forward and handed me everything minus my flashlight (which is now gone). I then walked to the construction area and told the BC and my Captain that I was released and asked if we could leave. We then proceeded back to the fire engine and returned to quarters in available status to meet with BC Roberts about a half hour later.

This was a very stressful and extremely embarrassing event in which I hope we can come up with a better way to work together in the field and on the freeway. At this point, I feel confused on how to act in this situation in the future. I believe I acted according to how I was trained in order to keep my crew, the ambulance crew, and all other on-scene personnel safe.
Jake Gregoire
619-247-5296

2

Exhibit 4

TRACK _____ EXHIBIT 2
DATE 9-16-15
WITNESS Gregoire
3 PAGES(S)
JULIA LENNAN, CSR #12843

February 5, 2014

This memorandum is submitted pursuant to the direct order of Deputy Chief Jim Garcia.

On the evening of February 4, 2014 I was driving E52 to an incident on I805S around Telegraph Canyon Road. (Please see Firehouse Report for official dispatch and response information). While driving southbound with my Code 3 lights on and approaching Orange Avenue I listened to radio traffic from USAR53 and SD E6 that they had traveled from Palm to Telegraph northbound and were unable to locate. With this information we decided to proceed southbound and exit Orange Avenue. When I crested a slight hill, I noticed about ¼ mile ahead in the center divide was an ambulance stopped with its lights on. I immediately commented to my Captain that I located the incident and began slowing the Engine with my lights on in the slow lane. When I reached about 5-10 mph, I began watching out my window and rear mirror for traffic to come to a stop as I needed to get across traffic in a relatively short duration. Once the traffic came to a stop, I began to slowly drive across at roughly a 30 degree angle to the lanes. While approaching the rear of the ambulance I noticed a law enforcement vehicle in the fast lane stopped about 50 yards behind me. Believing that they had stopped to give me room, I decided to back up the engine about 10-15 feet to reposition it so that I was out of the #2 lane, only in the #1 lane, and providing roughly a 25 foot safety zone between the front of the engine and the ambulance to protect EMS crew during patient packaging and loading.

After securing the engine, I exited my door and opened the passenger door behind me to put my helmet on to complete my safety gear. As I was putting my radio in my pocket I turned and was immediately confronted by a CHP Officer. ( I don't know is name, and with all respect will call him the shorter one, and his partner the taller one as they were several inches in height apart). This officer immediately began telling me that he didn't like the way I drive, that I am an unsafe driver and that there were cars ¼ mile skidding because of the way I came across the freeway. Being a bit surprised and caught off guard I told him that I felt as though I did the best I could as safely as I could under the circumstances and that this accident was hard to find as we had 2 other fire units drive right past it without seeing it. I then asked him his opinion of what could I have done differently, and without replying he walked away.

I then walked back to the accident scene to assist with patient care. I noticed that there were 2 patients already being taken care of by EMS so I proceeded towards the heavily damage vehicle to look for trapped victims along with the FF/PM from E6. While we were just starting to look into the vehicle, the FF/PM assisting me was called back by his Captain and was told that they were leaving. He looked at me and said sorry for not being able to help and left. I then finished searching the overturned vehicle and determined there were no additional trapped victims. I then approached the EMS crews who were helping with patient care, and made the comment to my Captain, who was the Incident Commander and was standing nearby, that one of the CHP officers gave me a hard time about the way I came upon the accident. From there I began to assist with patient care helping my co-workers with patient packaging, when I was yelled at by an officer over my left shoulder to move the fire engine.

I turned to talk to him and said that we would be done shortly and that I was blocking traffic for the safety of the operations about to take place at the back of the ambulance which we've been trained to do. He replied with "move it now"! At this point I realized that this was a different officer than the one who spoke to me initially and that he was significantly taller than the other officer. I soon realized that he was quite upset, so I took a step back and looked down at the positioning of the EMS vehicles to see if I could somehow appease him by moving them a little. I then confirmed that there was no safe way nor area to move either the engine or the ambulance to as there was no shoulder in the center divide due to construction. I stepped back to him and said, "hey, we are all in this together, we are just trying to help, it should only be a couple more minutes and then we will be gone". He said "I want you and your fire engine gone right now and back in your fire station!" It was at this point I began to realize that it was not about my moving of the engine to a different location so he could open up the one tied up traffic lane, but that it was about him actually kicking us off the freeway altogether.

After his statement I asked him if he is going to take over patient care and he replied with "the ambulance will." Then Captain Albright who was standing next to me at this time replied "who is going to take care of these two people one of which is laying in the dirt", the officer replied with "that's not my problem". He then immediately replied again with "if you do not leave right now I will arrest you." I replied with "I am sorry but I cannot do that." He replied with "then I am going to arrest you." I replied with "well, I guess you're just going to have to arrest me because I cannot move the engine right now." He then became quite angry, yelling at me to climb over the wall and come to him. I said ok, and asked if I could please at least let my supervisor (Captain Albright) know what was happening as he was about 30 feet away from me walking back to the fire engine. He angrily said "no, you are under arrest." At this point I yelled to my Captain that I am being arrested because I will not move the fire engine. (This is where it appears as though I was telling the media, however I was not). My Captain replied with "OK, I will let the Battalion Chief know. He then grabbed my hands putting them behind my back and at the same time I asked over my shoulder if I could at least notify my Captain of where you are taking me, and again I got the exact same reply "no, you are under arrest."

After he handcuffed me, he began walking me down the construction zone roughly 80-100 yards or so north of the incident to his car. I then asked him, "hey can we just stop and talk about this and work this out?" He replied with "no, you are under arrest." When we got to the front of his car, he walked me to the passenger side and began searching my turnout pockets while standing right in the middle of the #2 lane. I politely asked, "sir, this whole thing to me is about safety, could you please search my pockets and I'll tell you what I have on me, over on the other side of your vehicle"? He said "fine", and kind of maneuvered me over to the other side where he began emptying my pockets onto the hood of his vehicle. I told him that all I had on me is a pocket knife, a small flashlight, and a strap of webbing. He pulled all of those out of my pockets and placed them on the hood of his vehicle. He then wanted to know what I had in my large BA pocket on my chest, I told him that it was my Breathing mask for going into fires, and he said "well I want to see it anyway". At this point he removed my helmet and took my personal radio as well.

2

I asked him if he would not mind loosening the handcuffs a little as they were extremely tight and that I was not going anywhere and that I am cooperating. He then locked them, which made them tighten down even more. He walked me to the rear passenger door and moved the front passenger seat forward so that I could be put in the car. I asked one last time if he could please loosen the cuffs just a little as they were making my wrists and now shoulders really hurt, and he just closed the door without a reply. He then got into the driver's seat and asked me my name. I spelled it for him, and noticed that he misspelled my last name so I politely said that I think you misspelled it in your computer where he was logging my information. He then asked me my phone number and to confirm my home address. I asked him politely what exactly I was being arrested for and he told me "148" I then said that I did not know what that was and could he explain. He then got a bit confused, said the word "obeying." He then said, "I don't know I will have to ask my supervisor."

At this point I sat rather uncomfortably in the back of the car in amazement of how rude and rough he was with me. I felt like I was being treated as a criminal, which I guess he felt I was. After what seemed like a half hour, he opened my door and said "this is not over yet, you are not being arrested but I am not done with you! You are going to have to answer for your actions." I did not say a word as I felt as though I was being threatened and I was just happy to be getting out of the handcuffs. He said you are free to go but hold on I have some paperwork for you to sign. At this point I politely asked if my crew were in possession of the items he removed from my person, and he told me no that his partner has them for me. His partner (the shorter one) then stepped forward and handed me everything minus my flashlight (which is now gone). I then walked to the construction area and told the BC and my Captain that I was released and asked if we could leave. We then proceeded back to the fire engine and returned to quarters in available status to meet with BC Roberts about a half hour later.

This was a very stressful and extremely embarrassing event in which I hope we can come up with a better way to work together in the field and on the freeway. At this point, I feel confused on how to act in this situation in the future.  I believe I acted according to how I was trained in order to keep my crew, the ambulance crew, and all other on-scene personnel safe.

Jake Gregoire

619-247-5296